UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALAN BERREY,<br><br>     Plaintiff<br><br>     v.<br><br>EVOLVE CELLULAR, INC., AND LOWELL FELDMAN.<br><br>     Defendant. | C.A. NO.  1:23-CV-11433-LTS |

**Request for Judicial Notice in Support of Defendant Feldman's Motion to Dismiss For Lack of Personal Jurisdiction and/or Defendants' Motion to Dismiss and Transfer the Case to the Western District of Texas**

Pursuant to Federal Rule of Evidence 201, Defendants Evolve Cellular, Inc. ("Evolve") and Lowell Feldman ("Feldman") respectfully requests that the Court take judicial notice of the following documents.

1. The Complaint filed by Evolve in Texas State Court on May 26, 2023 and later removed to federal Court by Plaintiff herein, Alan Berrey ("Berry").  The state case is part of the federal court record and is entitled <u>Berrey v. Evolve Cellular, Inc</u>., Case No.1:2023cv11433 true and correct copy of which is attached herein as Exhibit A.

Judicial Notice of pleadings in other states are properly subject to Judicial Notice. See, e.g., <u>Airframe Systems, Inc. v. Raytheon Co</u>. 520 F. Supp. 2d 258, 262 (D. Mass. 2007).

2. The three employment agreements executed between Evolve and Berry attached herein as Exhibit B.  Two of these agreements are attached to the above matter as well as herein, and the third, the Employment Agreement which is referenced by Berrey in this action and Evolve in the Texas action.

Judicial Notice of these agreements are proper as they are reference in both this case as well as the Texas federal case. Sarvis v. Polyvore, Inc., No. 12-12233-NMG, 2013 U.S. Dist. LEXIS 112539, at *8-9 (D. Mass. Aug. 9, 2013) ("'where the plaintiff has referenced part of a document in the complaint, it is proper for the court to view the rest of that document so as to be able to understand it in context.'") quoting Airframe Sys. v. Raytheon Co., 520 F.Supp.2d 258, 263 (D. Mass. 2007).

Respectfully submitted,
EVOLVE CELLULAR, INC.
By their attorneys,


/s/ Lita M. Verrier
Lita M. Verrier (BBO #662147)
Jeanette M. Piaget Figueroa (BBO #707465)
JACKSON LEWIS P.C.
75 Park Plaza, 4th floor
Boston, MA 02116
(617) 367-0025
lita.verrier@jacksonlewis.com
jeanette.piagetfigueroa@jacksonlewis.com

Dated:  July 14, 2023

## <u>CERTIFICATE OF SERVICE</u>

This hereby certifies that on this 14th day of July 2023, I caused a true and correct copy of the foregoing document was filed with the Court via the ECF system and served via electronic mail to anyone unable to accept electronic filing.

*/s/ Lita M. Verrier*
Lita M. Verrier

4873-6957-2720, v. 1

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **EVOLVE CELLULAR INC.,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 1:23-cv-773** |
| | § | |
| **ALAN E. BERREY** | § | |
| **Defendant.** | § | |

## NOTICE OF REMOVAL

TO THE CLERK OF THE COURT:

Now comes Defendant, Alan E. Berrey, by his attorneys, and gives notice to the United States District Court for the Western District of Texas, as follows:

## I.       BACKGROUND

1.  This action involves a controversy which is wholly between citizens of different states, in that, plaintiff, was at the time of commencement of the action, and still is, a citizen of Texas, residing in that state, and that Alan E. Berrey, defendant in the action, was at the time of commencement and still is a citizen of Massachusetts, residing in that state, and not a resident or citizen of Texas.

2.  This action was commenced on May 30, 2023, in the district court of Travis County, by Evolve Cellular Inc. against Defendant, said action filed in the 53rd District Court of Travis County, as Evolve Cellular, Inc. v. Alan E. Berrey, and filed as Cause No. D-1-GN-23-002865.

3.  This action is of a civil nature in which Plaintiff seeks damages for personal injuries against the Defendants in a sum in excess of $75,000.00.

## II.       FEDERAL QUESTION

4.  Defendant states that Plaintiff is and was at the time of service of the Summons and Complaint, a corporation organized and existing under the laws of Texas with its principal place of

business in Texas, Plaintiff maintains its corporate headquarters and executive offices in the Texas where policy decisions are made and where the day-to-day control of the business is exercised. For purposes of diversity jurisdiction, Plaintiff is a citizen of Texas.

5.  Defendant is not a citizen of Texas now or at the time of the filing of this action.

6.  The aforesaid action is a civil action and involves dispute in controversy properly within the original subject-matter jurisdiction of the United States District Court because of diversity of citizenship and amount in controversy under 28 U.S.C.A. § 1332. It is an action which is removable to this court pursuant to the provisions of 28 U.S.C.A. § 1446.

### III.     PROCEDURAL REQUIREMENTS

7.  The Complaint was filed-stamped by the Court Clerk on May 30, 2023, and Service of Summons and Complaint was made on Defendant in Massachusetts, on June 15, 2023, for relief upon which this action is based. The following documents constitute all the process and pleadings purportedly served upon Defendant, copies of which are attached as Exhibit "1".

    a.  Summons with Complaint attached served upon Defendant

8.  This action first became removable on June 15, 2023, when Defendant received service of process. The filing of this Notice of Removal is timely in that it is filed within 30 days of the date upon which Defendant received service of process. 28 U.S.C.A. § 1446(b)(1)

**WHEREFORE**, Defendant prays that the action described, which is currently pending in the 53rd District Court of Travis County, as Cause No. D-1-GN-23-002865, be removed therefrom to this court.

Respectfully Submitted,

**KAPLAN LAW FIRM, PLLC**
3901 S Lamar Blvd. Suite 260
Austin, Texas 78704
Telephone: (512) 553-9390
Telecopier: (512) 692-2788
www.kaplanlawatx.com

By: */s/ Austin Kaplan* ___
**Austin Kaplan**
State Bar No. 24072176
akaplan@kaplanlawatx.com

**COUNSEL FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of July 2023, I sent a true and correct copy of the

foregoing documents to all counsel of record:

***Via EService:***
Michelle Alcala
malcala@leonalcala.com
Leon Alcala, PLLC
2901 Via Fortuna
Bldg. 6, Suite 475
Austin, Texas 78401
P: (512) 637-4244
F: (512) 637-4245

**ATTORNEY FOR PLAINTIFF**

_____

Austin Kaplan

CITATION
THE STATE OF TEXAS
CAUSE NO. D-1-GN-23-002865

EVOLVE CELLULAR, INC                                                     , PLAINTIFF(S)

vs.

ALAN E. BERREY                                                          , DEFENDANT(S)

TO:    ALAN E. BERREY
       67 WOODWARD LANE
       BOXBOROUGH MA 01719
       OR WHEREVER FOUND

Defendant, in the above styled and numbered cause:
YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a written answer with the clerk
who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served
this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk,
you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made
no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org."

Attached is a copy of the **PLAINTIFFS FIRST AMENDED PETITIION** in the above styled and numbered cause, which was filed on
**May 30, 2023** in the **53rd District Court** of Travis County, Austin, Texas.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office, **June 07, 2023**

REQUESTED BY:
ALCALA, MICHELLE
2901 VIA FORTUNA BLDG 6 #475
AUSTIN, TX  78401



Velva L Price
Travis County District Clerk
Civil Family Court Facility (CFCF)
1700 Guadalupe Street, P.O. Box 679003 (78767)
Austin TX 78701

Ruben Tamez, Deputy

R E T U R N

Came to hand on the _____ day of _____, _____ at _____ o'clock ____M., and executed at
_____ within the County of _____ on the _____ day
of _____, _____, at _____ o'clock ____M., by delivering to the within named
_____, each in person, a true copy of this citation together with
the **PLAINTIFFS FIRST AMENDED PETITIION** accompanying pleading, having first attached such copy of such citation to such
copy of pleading and endorsed on such copy of citation the date of delivery.

Service Fee: $ _____                              _____
                                                     Sheriff / Constable / Authorized Person

Sworn to and subscribed before me this the

_____ day of _____, _____.                By:_____

                                                     _____
                                                     Printed Name of Server

_____              _____ County, Texas
Notary Public, THE STATE OF TEXAS
D-1-GN-23-002865                                      **SERVICE FEE NOT PAID**

5/30/2023 3:56 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-23-002865
Ruben Tamez

CAUSE NO. D-1-GN-23-002865

| | | |
|---|---|---|
| EVOLVE CELLULAR INC., | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| | § | 53rd JUDICIAL DISTRICT |
| vs. | § | |
| | § | |
| ALAN E. BERREY, | § | |
| *Defendant.* | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| | § | |

## PLAINTIFF'S FIRST AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff, Evolve Cellular Inc., and files this First Amended Petition complaining of Defendant, Alan E. Berrey, and in support thereof, respectfully shows this Court as follows:

### I. DISCOVERY LEVEL

Discovery in this case is intended to be conducted in accordance with Rule 190, Level 3, of the Texas Rules of Civil Procedure.

### II. PARTIES

Plaintiff Evolve Cellular Inc., ("Evolve") is a Texas Corporation in good standing with its principal place of business in Bastrop County, Texas.

Defendant Alan E. Berrey ("Berrey") is an individual resident of Boxborough, Massachusetts. He may be served with process by delivering a copy of this petition and citation to his business address at 67 Woodward Lane, Boxborough, Massachusetts 01719.

1

## III. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over the matters pled in this action, and has, further, personal jurisdiction over all the parties as set forth below.

### Personal Jurisdiction Against Berrey

Although while working for Evolve Defendant Berrey resided in Massachusetts, he contracted with Evolve in Texas and worked as an employee for Evolve, a Texas corporation, with most of his dealings in Texas. Berrey has traveled to Texas for business meetings with Evolve, with no less than five trips to Travis, County, Texas for various company and customer meetings. The majority of the Evolve employees that Berrey interacted with weekly are in Texas and the Evolve work and the Evolve customers that Berrey works for at Evolve are in Texas, including the University of Texas School of Law.

In addition, Berrey contracted with Evolve in Texas, including by signing Evolve's Confidentiality and Non-Competition Agreement and a Non-Qualified Stock Option and Related Agreement (collectively the "Agreements), in which he agreed would be interpreted and enforced under Texas law and further agreed that any dispute or disagreements arising from the Agreement would be brought exclusively in the federal and state courts in Travis, County, Texas. Both Agreements are at issue in this lawsuit.

In the Confidentiality and Non-Competition Agreement, Berrey agreed that any court proceeding regarding the Agreement may only be brought in the federal and state courts in Travis County, Texas and expressly waived any objection to the venue of such proceeding in any such court or that such proceeding was brought in an inconvenient forum. Berrey further agreed in the Confidentiality and Non-Competition Agreement that the summons and complaint commencing a proceeding in any such courts shall be properly served and shall confer personal jurisdiction if

2

served as provided under the laws of the State of Texas. In addition, Berrey agreed that this provision may be filed with any court as written evidence of the knowing and voluntary irrevocable agreement between the parties to waive any objections to jurisdiction, to venue, or to convenience of forum. Berrey's Forum Selection Agreement is attached as Exhibit A, page 6.

### Venue

Venue is proper in Travis County, Texas in that all or a substantial part of the acts giving rise to the claim herein occurred in Travis County, Texas. Venue is proper additionally because the Agreements between the parties were executed in Travis County, Texas, and in the Agreements, the parties stipulated that Travis County would be the county of exclusive jurisdiction for related to the Agreements.

### IV. FACTS

1.      Evolve is a Mobile Network Operator and software development and technical solutions company that provides proprietary and/or standards based scalable communications solutions both on a retail and wholesale basis.

2.      Evolve's business is highly technical and specialized and involves developing custom software and network solutions that account for a multitude of regulatory, legal, and industry standards when involving voice, data, and messaging as part of either mobile or internet communications (or often both). Confidential Information of the Company includes:

- Trade Secret information as to capability and quality of various other software and/or solutions companies that can be used as suppliers or co-vendors;

- Trade Secret information as to capability and quality of various other software and/or solutions companies that could provide competitive products;

- Trade Secret information as to known and/or suspected patent violations of competitor products;

- Knowhow and Trade Secret information on the effectiveness of so-called open source software and projects in the communications industry;

- Names and key contact information of customers;

- Names and key contact information of suppliers;

- Work product related to historical and future patents; some of which have been granted to Evolve;

- Proprietary and Trade Secret information related to the operations and implementation of what is known as the GSMA Network Settings Exchange as well as other confidential and trade secret information related to small carriers and the GSMA's interworkings;

- Confidential, Proprietary, and trade secret information about Evolve's relationships with other Mobile Network Operators and the impacts of possible roaming, network sharing, and spectrum agreements among and between Evolve and these other parties.

3. On or around March 1, 2016, Evolve's wholly-owned subsidiary "Scratch Acquisition" acquired all of the assets of Scratch Wireless, which was founded, managed, and owned by Berrey.

4. Because Berrey was familiar with the specific technology, assets, and business plans acquired by Evolve, Evolve wanted to hire Berrey as its Vice President of Business Development.

5. As the Vice President of Business Development for Evolve, Berrey would have access to Evolve's Confidential Information, including its ability to utilize its legal rights as a

licensed Mobile Network Operator to create and provide capabilities and services that take advantage of what is known as a "Mobile Identity, which is internet based, and if appropriate, would work on integrating various aspects of technology Evolve acquired from Scratch Wireless into systems, operations and development projects of Evolve.

6.      Accordingly, prior to Evolve's hiring of Berrey, Evolve required Berrey to enter into an Employment Confidentiality and Non-Competition Agreement.

7.      On or about March 1, 2016, Berrey signed an Employment Agreement and a Confidentiality and Non-Competition Agreement as a condition of his employment with Evolve. The Confidentiality and Non-Competition Agreement is supported by consideration and is valid and enforceable. A true and correct copy of that Agreement is attached hereto as "Exhibit A" and is incorporated within this petition in its entirety. The Confidentiality and Non-Competition Agreement contains both non-compete provisions, non-solicitation provisions, as well as provisions protecting Evolve's trade secrets and confidential information as therein defined.

8.      When the initial term of Berrey's Employment Agreement expired, in July of 2017, Berrey became an at-will employee and executed a Non-Qualified Stock Option and Related Agreement. The Non-Qualified Stock Option and Related Agreement contains both non-compete provisions, non-solicitation provisions, as well as provisions protecting Evolve's trade secrets and confidential information as therein defined.

9.      Evolve gave Berrey access to its Confidential Information in consideration for his execution of the Agreement attached as Exhibit A and continued to provide him with new Confidential Information when he became an at-will employee in 2017, in exchange for his agreement in Exhibit B.

10.  The Confidentiality And Non-Competition Agreement in Exhibit A, contains the following restrictive covenants agreed to by Berrey, in relevant part:

(i) **Confidentiality and Intellectual Property.**

(ii) Non-Competition. **During the Non-Competition Period, the Employee will not,** directly or indirectly as a stockholder, partner, member, manage, employee, consultant or owner of, lender to, or investor or participant in, any individual partnership, firm, corporation or other entity.... **Engage in or assist any other Person to engage in, and Covered Business anywhere in the Covered Area**.

11.  "Non-competition period" is defined in the Confidentiality and Non-Competition Agreement attached as Exhibit A as the period commencing as of the date of this Agreement and ending one years [sic] after the Employee ceases to be an employee of the Company for any reason . . . See Exhibit A, page 5.

12.  "Covered Business" is defined in the Confidentiality and Non-Competition Agreement, attached as Exhibit A, as any business that directly or indirectly designs, develops, markets or sells platform technology and communications goods and/or services. . . Without limiting the generality of the foregoing, such goods include customized intergraded softphone products that may be embedded between mobile devices and gateway platforms. Such goods and services involved in a Covered Business include, without limitation, any good or service that enable consumers and business users and their device supplies to (i) control the device for voice, date and instant messaging, (ii) manage the user's present and services using their own software, and/or (iii) enable all services via a non-cellular based date network, including but not limited to the public internet. Such goods and services also include, without limitation, any goods or service

relating to (i) voice and data services to consumers and business in markets covered directly by LTS license spectrum and/or (ii) a MVNO wifi-first cell phone services. See Exhibit A, p. 5.

13.    "Covered Area" is defined in the Confidentiality and Non-Solicitation Agreement attached as Exhibit A as (a) any area in the United States where the Company Parties (i) do business or (ii) are actively planning to do business (as indicated by discussions of the Company's board of directors) in either case during the Employee's employment with the Company. . . . See Exhibit A, p. 5.

14.    The Non-Competition covenants in the Non-Qualified Stock Option and Related Agreement attached as Exhibit B contains the following restrictive covenants agreed to by Berrey:

> **13. Covenant of Optionee.**
>
> (a)    **Non-competition; Non-Solicitation of Customers and Optionees.**
>
> (i)    During the term of this Agreement and **for a period of eighteen (18) months from the termination of Optionee's [Berrey's] employment with the Company** (the "Termination Date"), **[Berrey[ shall not, directly or indirectly, as a partner, joint venturer, employer, employee, contractor, consultant, member, manager, shareholder, director, officer, trustee, principal or agent engage in, control, advise with respect to, manage, act as a consultant to, receive any economic benefit from or exert any influence upon any business or *businesses* engaged in the Business in the states where the Company or its affiliates or their predecessors have previously operated, currently operate, or contemplate operating in the reasonably foreseeable future as of the Termination Date. (Emphasis added).**

15.     "Business" is defined in Exhibit B, the Agreement as: offering, marketing, providing, selling or reselling or otherwise being involved in any of the following:

(A)     WiFi-first and/or WiFi primary smartphone services that rely on unlicensed frequency as a primary method of connectivity;

(B)     LTE radio network access buildout and/or operation for private use (also known as "Private LTE") which can include First Net Bands, Citizens Bands and/or unlicensed frequencies for use by education school systems (including college and university campuses), rural entities with access to LTE Band 14 frequency and enterprise customers who maintain campus and/or multiple location presence,

(C)     mobile network operator certification of applications and devices (including those for smartphones and IoT applications and devices),

(D)     delivery and/or customization of voice services involving enhanced signaling information designed for use by IP Multimedia Subsystem (IMS) application servers,

(E)     customized 8YY and DID services delivered to contact centers, and

(F)     use of database access technology to stimulate Rich Communications Services (RCS) or Universal Profile based services, as those terms are commonly referred to in the cellular phone service and related industries.

16.     As the Vice President of Business Development, Berrey has had access to Evolve's confidential information and he has interacted with Evolve's contact information for its key customers, which is also considered Confidential Information.

17.    Evolve would not have given Berrey access to its customer information or its confidential, proprietary, and trade secret information without Berrey being bound by the Confidentiality and Non-Competition provisions in the Agreements.

18.    With respect to the non-compete provisions of the Agreements, they were ancillary to or part of an otherwise enforceable agreement, were supported by adequate independent consideration at the time that it was made, and are reasonable in time, geographical area, and scope of activity to be restrained. The provisions do not impose a greater restraint than is necessary to protect the goodwill or other business interest of Evolve.

19.    By the day's end of June 5, 2023, Defendant, Alan E. Berrey is anticipated to resign from his employment at Evolve. Though Berrey is bound by the provisions of the Agreements, he has failed and/or refused to give assurances to Evolve that he is subject to the non-competition, non-solicitation, and confidentiality covenants in the Agreements after his resignation. In fact, he has refused to talk with Evolve about his obligation under the written Agreement directly; instead, he has directed Evolve to his attorney in Massachusetts.

20.    When presented with Exhibit B, the written agreement and asked if he would honor the specific terms of such agreement with respect to the confidentiality and non-compete provisions, Berrey refused to answer in the affirmative and has subsequently referenced his desire to pursue litigation, based on Evolve reducing his salary in March 2020.

21.    In 2020, Berrey was an at-will employee and his salary at Evolve was reduced by 50% from $15,000 to $7,500 per month and he was transitioned from servicing a large customer who had canceled their projects that Berrey oversaw.    Berrey, through an attorney in Massachusetts, has recently sent Evolve demand letters, insisting that there is an oral agreement

between Evolve and Berrey that requires pay back of his original salary before it was reduced in March 2020.

22.     Upon information and belief, it is believed that Berrey may try to circumvent the provisions of the Agreements after the resignation of his employment, causing irreparable harm and injury to Evolve, for which there is no adequate remedy at law.

23.     When preparing his departure notices to Evolve customers of his upcoming resignation from Evolve, Berrey has refused to include in the notices a confirmation that he will not be directly or indirectly continuing to work in the communications industry in competition with Evolve.

24.     In addition, Berrey has refused to tell Evolve what his plans are for his future employment.

## V. DECLARATORY JUDGMENT

Evolve seeks a declaration from this Court, under Chapter 37 of the Texas Civil Practices & Remedies Code, that the Agreements are valid and enforceable in every respect, and that Berrey is bound by their terms and provisions.

In addition, Evolve seeks a declaration from this Court, under Chapter 37 of the Texas Civil Practices & Remedies Code that declares Berrey's claims of an oral agreement are barred by the statute of frauds, which requires that a promise or agreement which is not to be performed on a year from the date of making the agreement must be in writing. Tex. Bus. & Commerce Code Section 26.01(6). Berrey was an employee at will at Evolve and any alleged agreement to defer Berrey's compensation for over three years even if it existed —which it did not— is not enforceable because it is not in writing.

## VI. APPLICATION FOR TEMPORARY RESTRAINING ORDER,
## TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION

Evolve seeks a temporary restraining order against Berrey restraining him from undertaking any competitive activity in breach of the Agreements, any solicitation activity in breach of the Agreements, or any activity in breach of the confidentiality and trade secret provisions of the Agreements. A temporary restraining must be issued because between the time that Berrey resigns from Evolve, Berrey could violate the provisions of the Agreements, contact Evolve's customers, and seriously prejudice or injury Evolve with respect to its business interests. Such a threat is immediate and would result in irreparable injury.

Evolve further seeks a preliminary injunction enjoining Berrey from violating his obligations under the Agreements until final trial of this cause. Upon the trial of this cause, Evolve seeks a permanent injunction enjoining Berrey from violating his obligations under the Agreements. See Tex. Bus. & Comm. Code § 15.50 et seq.

## VII. CONDITIONS PRECEDENT

All conditions precedent to the bringing of this supplemental counterclaim have been met or have occurred.

## VIII. COSTS

Evolve prays for all costs of court.

## IX. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Evolve Cellular Inc., prays for temporary restraining order as herein prayed for, that citation be issued, that Defendant, Alan E. Berrey, be made to appear and answer, and that following trial of this case it obtain declaratory

relief finding that the terms and provisions of the Agreements are valid and enforceable, that any alleged oral agreement to defer Berrey's compensation for over three years is unenforceable, and further prays for preliminary and permanent injunctive relief enforcing the terms of the Agreements. Evolve further prays for such other relief, at law or in equity, to which it is justly entitled.

Respectfully submitted,

*/s/ Michelle Alcala*
Michelle Alcala
State Bar No. 24040403
Leon | Alcala, PLLC
2901 Via Fortuna
Bldg. 6, Suite 475
Austin, Texas 78401
T: 512.637.4244
F: 512.637.4245
E: malcala@leonalcala.com

**ATTORNEYS FOR EVOLVE**
**CELLULAR INC.**

# CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

This Confidentiality and Non-Competition Agreement ("**Agreement**"), entered into as of _____, 2016 (the "Effective Date"), by and between (i) EVOLVE CELLULAR INC., a Texas corporation ("**Employer**") whose principal business office is located in the Austin, Texas area, and (ii) Alan Besley (the "**Employee**");

## WITNESSETH:

WHEREAS, the Employee has agreed to employment with the Company pursuant to the terms of an Employment Agreement dated on or about the date of this Agreement by and between the Employee and Employer (as modified from time to time, the "**Employment Agreement**");

WHEREAS, certain capitalized terms hereunder are defined in Section 7 of this Agreement;

WHEREAS, the Employee will be a key employee of the Company, with significant access to information concerning the Company and certain of its affiliates, and each of their respective businesses, including without limitation the development of the Company's business plans and strategies, its proprietary products and services, and key information about its customers and suppliers; and

WHEREAS, the disclosure or misuse of such information or the engaging in competitive activities would cause substantial harm to the Company, certain of its affiliates, and each of their respective businesses;

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto agree as follows:

1.  **Confidentiality and Intellectual Property.**

    (a)  The Employee shall not at any time, directly or indirectly, disclose, divulge or use any Confidential Information, except (i) as reasonably required in connection with the performance of the Employee's duties for the Company, including as provided under the Employment Agreement, (ii) to the extent disclosure is required by law (but, to the extent permitted by law, only after the Employee has provided the Company with reasonable notice and opportunity to take action against any legally required disclosure), or (iii) in connection with the enforcement of the Employee's rights under any written agreement with the Company or under applicable law. Notwithstanding the foregoing, nothing in this Agreement shall prohibit the Employee from providing truthful information (including Confidential Information) about the Company or any other matter as may be required by law, in response to any court order, subpoena or other legal compulsion to disclose, or from cooperating with or providing truthful information (including Confidential Information) about the Company or any other matter to any governmental agency in connection with any inquiry by such agency.

(b)     Upon the Employee's termination of employment with the Company for any reason, or upon the Company's written request at any time and for any reason, the Employee shall immediately deliver to the Company all materials (including all soft and hard copies) then in the Employee's possession or control that contain or relate to Confidential Information and all other property of the Company; provided, that the Employee may deliver to his attorneys copies of any such materials to the extent necessary for the enforcement of the Employee's rights under any written agreement with the Company or under applicable law and the Employee shall be entitled to retain a copy of his address book, benefit plan elections, employment agreement, confidentiality and non-competition agreement, equity awards, and related documents.

(c)     All Developments made by the Employee, either alone or in conjunction with others, at any time or at any place during the Employee's employment with the Company, whether or not reduced to writing or practice during such period of employment, shall be and hereby are the exclusive property of the Company without any further compensation to the Employee. Without limiting the generality of the prior sentence, all Developments which are copyrightable work by the Employee are intended to be "work made for hire" as defined in Section 101 of the Copyright Act of 1976, as amended, and shall be and hereby are the property of Employer.

(d)     The Employee shall promptly disclose the Developments to Employer. If any Development is not the property of Employer by operation of law, this Agreement or otherwise, the Employee will, and hereby does, assign to Employer (or its designee) all right, title and interest in such Development, without further consideration, and will assist the Company and its nominees in every way, at the Company's expense, to secure, maintain and defend the rights of Employer (or such designee) in such Development. The Employee shall sign all instruments necessary for the filing and prosecution of any applications for, or extension or renewals of, letters patent (or other intellectual property registrations or filings) of the United States or any foreign country which the Company desires to file and relates to any Development. **The Employee hereby irrevocably designates and appoints Employer and its duly authorized officers and agents as the Employee's agent and attorney-in-fact (which designation and appointment shall be deemed coupled with an interest and shall survive the Employee's death or incapacity), to act for and on the Employee's behalf to execute and file any such applications, extensions or renewals and to do all other lawfully permitted acts to further the prosecution and issuance of such letters patent, other intellectual property registrations or filings or such other similar documents with the same legal force and effect as if executed by the Employee.**

2.     **Noncompetition.** During the Noncompetition Period, the Employee will not, directly or indirectly, as a stockholder, partner, member, manager, employee, consultant or owner of, lender to, or investor or participant in, any individual, partnership, firm, corporation or other entity (each, a "**Person**") other than the Company Parties, engage in or assist any other Person to engage in, any Covered Business anywhere in the Covered Area; provided, however, the passive ownership by the Employee of 3% or less of the outstanding voting securities of any Person whose securities are traded on a nationally recognized securities exchange or market (or, greater than 3% of such securities of any such entity, so long as the Employee's total investment in such entity does not exceed $1,000,000 in the aggregate) shall not constitute a violation of this Section 2.

2

3.     **Nonsolicitation.** During the Noncompetition Period,

(a)     The Employee will not, directly or indirectly, (i) solicit, or endeavor to entice away from, any Company Party, (ii) employ, hire or engage, or (iii) interfere with the business relationship of any Company Party with, any Person who is then, or was within the 12 months preceding such action, an employee of any Company Party or an individual independent contractor whose primary engagement is by a Company Party; provided, however, that nothing in this Section 3(a) shall be deemed to prohibit the Employee, directly or indirectly, from advertising employment opportunities in media of general circulation (provided that such advertisements do not target any individual who is or was an employee or independent contractor of any Company Party).

(b)     The Employee will not, directly or indirectly, (i) solicit, or endeavor to entice away from, any Company Party, (ii) endeavor to reduce the business conducted with any Company Party by, or (iii) interfere with the business relationship of any Company Party with, any Person who is then, or was within the 12 months preceding such action, a customer, client, distributor, dealer, supplier, vendor, independent contractor (other than an individual independent contractor whose primary engagement is by a Company Party), consultant or service provider of or for, or other Person having a business relationship with, any Company Party.

(c)     The Employee will not assist any Person in performing any activity prohibited by this Section.

4.     **Nondisparagement.** The Employee will not, directly or indirectly, make any disparaging statement or other negative remarks, written or oral, about any Company Party or their respective Representatives. None of Employer or any of the other Company Group Members will authorize any director or officer of the Company Parties to, directly or indirectly, make any disparaging statement or other negative remarks, written or oral, about the Employee or his Representatives. This Section shall not prohibit any party from testifying truthfully as a witness in any court proceeding or governmental investigation or otherwise under legal compulsion to do so.

5.     **Remedies.** Without limiting the remedies available to the Company Parties, the Employee acknowledges that a breach of any of the covenants contained in this Agreement by the Employee could result in irreparable injury to the Company Parties for which there might be no adequate remedy at law, and that, in the event of such a breach or threat thereof, the Company Parties shall be entitled to seek to obtain a temporary restraining order or a preliminary injunction and a permanent injunction restraining the Employee from engaging in any activities prohibited by this Agreement and such other equitable relief as may be required to enforce specifically any of the covenants contained in this Agreement, without any requirement to post a bond or prove damages. To the extent permitted by law, the losing party in any action for enforcement of the terms of this Agreement shall pay the reasonable attorneys' fees, costs and other expenses of the prevailing party incurred in connection with any Proceeding directly or indirectly relating to or arising out of this Agreement or any breach or alleged breach hereof.

6.     **Acknowledgements.** The Employee represents and warrants that he (a) has carefully read and understands all of the provisions of this Agreement and has had the opportunity

3

for this Agreement to be reviewed by counsel, (b) acknowledges the highly competitive nature of the business of the Company Parties and that the duration, geographical scope and subject matter of this Agreement are reasonable and necessary to protect the goodwill, customer relationships, legitimate business interests, trade secrets and confidential and proprietary information of the Company Parties, (c) has not relied upon any representation or statement made by the Company Parties or their respective Representatives with regard to the subject matter of this Agreement, (d) will be able to earn a satisfactory livelihood without violating this Agreement, (e) is not a party to any agreement, commitment or obligation that could reasonably be expected to conflict with the Employee's obligations under this Agreement, or limit the Employee's ability to perform the Employee's duties for the Company and (f) acknowledges that the Company would not agree to employ the Employee without the benefits contained in this Agreement. The Employee understands and agrees that (i) this Agreement shall survive the termination of the Employee's employment for any reason, and (ii) no change in the Employee's compensation or employment duties after the date of this Agreement and the commencement of the Employee's employment with the Company shall alter or change the Employee's obligations under this Agreement.

7. **Defined Terms.** As used herein, the following terms shall have the following meanings:

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such specified Person.

"**Company**" means, collectively, Employer and its Controlled Affiliates, together with their respective successors and assigns.

"**Company Group Member**" means any of the Company, Worldcall Interconnect Inc. and Texas AirTowers LLC.

"**Company Parties**" means, collectively, (i) the Company Group Members, (ii) any supplier of goods or services to any Company Group Member; and (iii), together with their respective successors, assigns and affiliates; provided, that for purposes of Sections 2, 3 and 4 of this Agreement, the term shall not include any Person who becomes a Company Group Member following the date of termination of the Employee's employment unless the Company was actively planning to engage in a business arrangement with such Person during the Employee's employment with the Company.

"**Confidential Information**" means all Trade Secrets and all other information of a business, financial, marketing, technical or other nature relating to the business of the Company Parties, including, without limitation, (i) any customer or vendor lists, prospective customer names, financial statements and projections, know-how, pricing policies, operational methods, methods of doing business, technical processes, formulae, designs and design projects, inventions, computer hardware, software programs, business plans and projects pertaining to the Company Parties and (ii) any information of others that any the Company Party has agreed to keep confidential; provided, that Confidential Information shall not include any information that has entered or enters the public domain other than by reason of the breach by any Person of an obligation to keep such information confidential.

4

"**Controlled Affiliates**" means any Affiliate of a Person of which such Person directly or indirectly controls, which shall mean that such Person directly or indirectly has the ability to directly or indirectly direct or cause the direction of the management and policies (whether by contract or otherwise) of such Affiliate.

"**Covered Area**" means (a) any area in the United States where the Company Parties (i) do business or (ii) are actively planning to do business (as indicated by discussions of the Company's board of directors), in either case during the Employee's employment with the Company, and (b) if the Company Parties elect to pursue business outside of the United States, the areas outside of the United States where the Company Parties (i) do business or (ii) are actively planning to do business (as indicated by discussions of the Company's board of directors), in either case during the Employee's employment with the Company.

"**Covered Business**" means any business that directly or indirectly designs, develops, markets or sells platform technology and communications goods and/or services focused on supporting machine-to-machine, Internet of Things, unified communications, and customized wholesale mobile software and services, including without limitation services provided by, through or relating to gateway server abilities and software and mobile network operation interconnection services and/or related numbering rights (including number porting), SIM creation and management, and device certification. Without limiting the generality of the foregoing, such goods include customized integrated softphone products that may be embedded between mobile devices and gateway platforms. Such goods and services involved in a Covered Business include, without limitation, any good or service that enables consumers and business users, and their device suppliers, to (i) control the device for voice, data and instant messaging, (ii) manage the user's presence and services using their own software, and/or (iii) enable all services via a non-cellular based data network, including but not limited to the public internet. Such goods and services also include, without limitation, any good or service relating to: (i) voice and data services to consumers and businesses in markets covered directly by LTE licensed spectrum, and/or (ii) a MVNO wifi-first, cell phone service.

"**Developments**" means all inventions, modifications, discoveries, designs, developments, improvements, processes, software programs, works of authorship, documentation, formulae, data, techniques, know-how, secrets or intellectual property rights or any interest therein that (i) relate to the Business, (ii) are created or improved in whole or in part by using any resources, data, facilities or equipment of any Company Party or (iii) are created or improved within the scope of the Employee's employment with the Company.

"**Employer**" means any of the Company Parties that employs (or formerly employed) the Employee.

"**Investors**" means any party that holds an equity position in the Company and any of such holder's Related Persons).

"**Noncompetition Period**" means the period commencing as of the date of this Agreement and ending one years after the Employee ceases to be an employee of the Company for any reason; provided that if the Employee violates Section 2 or 3 of this Agreement, the length of the

Noncompetition Period shall be extended by a period of time equal to the period of time of the violation. For purposes of this Agreement and the related defined terms, the terms "employment," "employ," "employee" or words of similar import shall include any period in which the Employee is a consultant, director or manager of any Company Party.

"**Proceeding**" means any demand, claim, counterclaim, setoff, action, complaint, petition, suit, mediation, audit, inquiry, assessment, examination or other proceeding (whether at law or in equity), investigation, inspection or arbitration before or by a governmental authority.

"**Related Person**" means, with respect to any Person, (a) an Affiliate of such Person, (b) any investment manager, investment advisor, managing member or general partner of such Person, (c) any investment fund, investment partnership, investment account or other investment Person whose investment manager, investment advisor, managing member or general partner is such Person or any other Person described in this definition or, (d) upon or in connection with the dissolution or liquidation of such Person, any equity investor, member or partner of such Person.

"**Representatives**" means, with respect to any Person, the directors, officers, employees of, and individual independent contractors whose primary engagement is by, such Person, and, to the extent such relationship to any such Person is known to the Employee, the Affiliates, consultants, financial advisors, attorneys, accountants and agents of such Person.

"**Trade Secret**" means information that either (i) (A) derives actual or potential independent economic value from not being generally known to, and not being readily ascertainable by proper means by, the public or any other person who can obtain economic value from its disclosure or use, and (B) is the subject of efforts by the Company Parties that are reasonable under the circumstances to maintain its secrecy, or (ii) otherwise comes under the definition of a "trade secret" under any applicable law.

**8.** **Notices.** All notices, demands or other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered in person, by United States mail, certified or registered with return receipt requested, or by a nationally recognized overnight courier service, or otherwise actually delivered: (a) if to the Employee, to the address of the Employee in the Company's payroll records; (b) if to the Company, to the Company at 1250 S. Capital of Texas Hwy., Bldg. 2-235, West Lake Hills, Texas 78746, Attn: President; or (c) at such other address as may have been furnished by such person in writing to the other parties. Any such notice, demand or communication shall be deemed given on the date given, if delivered in person, on the date received, if given by registered or certified mail, return receipt requested or given by overnight delivery service, or three days after the date mailed, if otherwise given by first class mail, postage prepaid.

**9.** **Governing Law; Forum.** This Agreement, and any contest, dispute, controversy or claim arising hereunder or related hereto, will be governed by and construed in accordance with the internal laws of the State of Texas applicable to agreements made and to be performed in that state, without reference to its principles of conflicts of law that would apply the laws of another jurisdiction. The parties hereto irrevocably submit, in any Proceeding directly or indirectly relating to or arising out of this Agreement, to the exclusive jurisdiction of the courts of the State of Texas or any federal court (in each case located in

6

Travis County, Texas), consent that any such Proceeding may only be brought in such courts, waive any objection that they may now or hereafter have to the venue of such Proceeding in any such court or that such Proceeding was brought in an inconvenient forum and agrees to be bound by any judgment rendered thereby in connection with this Agreement. Each of the parties further agrees that a summons and complaint commencing a Proceeding in any of such courts shall be properly served and shall confer personal jurisdiction if served to it at the address and in the manner set forth in Section 8 or as otherwise provided under the laws of the State of Texas. This provision may be filed with any court as written evidence of the knowing and voluntary irrevocable agreement between the parties to waive any objections to jurisdiction, to venue or to convenience of forum.

10. **Claims of Employee are Separate Matters**. The existence of any claim or cause of action by Employee against any Company Party, whether predicated upon this Agreement or otherwise, shall not constitute a defense to the enforcement of the restrictive covenants set forth herein by any Company Party, but shall be claimed and litigated separately.

11. **Required Notice by Employee**. Employee shall notify any prospective employer of the existence and nature of this Agreement.

12. **Counterparts.** This Agreement may be executed in any number of counterparts, including counterpart signature pages or counterpart facsimile signature pages, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13. **Headings.** The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

14. **No Strict Construction.** The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises under any provision of this Agreement, this Agreement shall be construed as if drafted jointly by the parties thereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authoring any of the provisions of this Agreement.

15. **Waiver of Jury Trial. Each party to this Agreement hereby irrevocably and unconditionally waives to the fullest extent permitted by applicable legal requirements all right to trial by jury in any Proceeding (whether based in contract, tort or otherwise) directly or indirectly relating to or arising out of this Agreement.**

16. <u>**Severability and Enforceability**</u>. Employee and the Company agree that if any particular paragraphs, subparagraphs, phrases, words, or other portions of this Agreement are determined by a court of competent jurisdiction to be invalid or unenforceable as written, they shall be modified as necessary to be valid or enforceable, and such modification shall not affect the remaining provisions of this Agreement, or if they cannot be modified to be made valid or enforceable, then they shall be severed from this Agreement, and all remaining terms and provisions shall remain enforceable. Accordingly:

(a) The parties agree that the Noncompetition Period is fair, reasonably required for the protection of Company, and should be deemed valid and enforceable. However,

7

the parties agree that if a court called upon to enforce the Agreement considers the Noncompetition Period to be overbroad, the court shall have the authority to blue pencil or otherwise revise the Noncompetition Period to the extent necessary to satisfy the court that the Noncompetition Period is fair and reasonably required for the protection of Company.

(b)    The parties express their desire that a court called upon to enforce any provision of the Agreement amend the parties' agreement to make the provision reasonable in the event the court determines such provision to be unreasonable. The parties agree that if a court considers a particular provision of this Agreement to be invalid, overbroad, vague, or otherwise unenforceable, the provision shall be deemed amended to the extent necessary to fulfill the intentions of the parties. If the court is unable to determine the intention of the parties, the offending provision shall be deemed amended to omit therefrom the language objected to by the court.

17.    **Entire Agreement.** This Agreement and the Employment Agreement between the Employee and Employer dated on or about the date hereof supersede all prior contracts between the parties with respect to its subject matter and constitute a complete and exclusive statement of the terms of the contract between the parties with respect to the subject matter hereof and thereof.

18.    **Binding Effect.** Neither party may assign this Agreement or any of his or its rights, duties or obligations hereunder, except that the Company shall have the right to assign this Agreement to any parent or subsidiary of the Company with the prior consent of the Employee (not to be unreasonably withheld, delayed or conditioned) or to any person or entity to whom or which all or substantially all of the business of the Company may be transferred. This Agreement shall be binding on and inure to the benefit of the parties hereto and their respective heirs, executors and administrators, successors and assigns.

19.    **Amendments and Waivers.** This Agreement may be amended, modified or supplemented only by written agreement of Employer and the Employee. Any failure of the Employer to comply with any term or provision of this Agreement may be waived by the Employee, and any failure of the Employee to comply with any term or provision of this Agreement may be waived by Employer, at any time by an instrument in writing signed by or on behalf of such other party, but such waiver (a) shall only be valid if set forth in a written instrument signed by the waiving party and (b) shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure to comply. No failure to exercise or delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

20.    **Third Party Beneficiaries.** The Company Parties are intended third party beneficiaries of this Agreement and, as such, shall be entitled to enforce the provisions of this Agreement.

[The remainder of this page is left blank intentionally.]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date and year first above written.

EVOLVE CELLULAR INC.

By _Zandl Feldman_____
    Name:_____
    Title:_____


_____

Alan Berrey

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date and year first above written.

EVOLVE CELLULAR INC.

By_____
    Name:_____
    Title:_____

Alan Berrey

**NON-QUALIFIED STOCK OPTION AND RELATED AGREEMENT**

THIS NON-QUALIFIED STOCK OPTION AND RELATED AGREEMENT ("Agreement"), dated as of July 12, 2017, is by and between Evolve Cellular Inc., a Texas corporation (the "Company"), and Alan Berrey ("Optionee").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  **Grant of Option; Vesting Schedule.**

    (a)  *Grant of Option.* Subject to the vesting and other terms and conditions set forth below, the Company hereby grants to Optionee an option (the "Option") to purchase from the Company 7,266.8111 shares (the "Option Shares") of the Company's common stock, par value $0.0001 per share ("Common Stock").

    (b)  *Exercise Price.* The purchase price (the "Exercise Price") of each of the Option Shares shall be equal to $60.181398050 per share, subject to adjustment as provided for in this Agreement.

    (c)  *Vesting Schedule.* The Option to acquire Option Shares shall vest in Optionee as follows, so long as Optionee is (on the applicable vesting date set out below) an employee of the Company (each such vesting date identified in the following provisions of this clause (c) being referred to herein as a "Vesting Date"):

        (i)    ten percent (10%) of the Option Shares subject to the Option shall vest on the August 31, 2017 (the "Vesting Commencement Date");

        (ii)   an additional twenty percent (20%) of the Option Shares subject to the Option shall vest on the first anniversary of the Vesting Commencement Date;

        (iii)  an additional thirty percent (30%) of the Option Shares subject to the Option shall vest on the second anniversary of the Vesting Commencement Date; and

        (iv)   the final forty percent (40%) of the Option Shares subject to the Option shall vest on the third anniversary of the Vesting Commencement Date.

    (d)  *Exercise Period.* Subject to the terms and provisions of this Agreement, so long as Optionee is then an employee of the Company, the Option to acquire Option Shares that have vested in accordance with the vesting schedule set out in clause (c) of this Section may be exercised by Optionee, in whole or in part, beginning on such vesting date and continuing until August 31, 2024 (the "Termination Date"), unless earlier terminated in accordance with the provisions of this Agreement. For the avoidance of doubt, after the Termination Date, Optionee shall have no further right to acquire any of the Option Shares.

    (e)  Conditions to Vesting. The Option shall vest on each Vesting Date described above only in the event that Optionee is in the employ of the Company on such date. If Optionee is not

1

in the employ of the Company on any Vesting Date, then (except as otherwise provided in this Agreement with respect to various events resulting in or relating to termination of employment) this Option shall be deemed to have automatically terminated and Optionee shall have no further right to exercise the Option. The period beginning on the Vesting Commencement Date and ending on the Termination Date is sometimes referred to herein as the "Option Period." In addition, this Option shall not be exercisable, unless and until Optionee has executed and returned to the Company the Special Buy-Sell Agreement referred to in this Agreement. For the avoidance of doubt, employment of Optionee by the Company or any of its wholly-owned subsidiaries shall be deemed to constitute employment by the Company for purposes of calculating dates and periods of employment, including terminations of employment.

(f)     The Option is not an "incentive stock option" as described in Section 422A of the Internal Revenue Code of 1986, as amended.

2.     **Optionee Termination.**  In the event that Optionee's employment with the Company is terminated during the Option Period, then:

(a)     *Termination for Cause.* If such employment was terminated by the Company for "Cause," then any portion of the Option that was not properly exercised by Optionee at least twenty-one (21) days prior to the effective date of such termination shall immediately terminate and be of no further force or effect, and Optionee shall have no further right to exercise any portion of this Option, notwithstanding any provision of this Agreement to the contrary. As used herein, the term, "Cause" means any of the following, as determined by the Company: (i) Optionee has committed an act of fraud, theft or embezzlement or been convicted of, or pled guilty or nolo contendere to, any felony that (as to any such felony) would reasonably be expected to result in damage or injury to the Company or any of its affiliates, or to the reputation of any such party; (ii) Optionee has committed an act constituting gross negligence or willful misconduct that is materially harmful to the Company or any of its affiliates; (iii) Optionee has engaged in any action that is a violation of a material covenant or agreement of Optionee in favor of the Company or any of its affiliates and such violation, if curable, is not cured within fifteen (15) days of receipt by Optionee of written notice of such violation, (iv) Optionee has materially breached any material covenant or agreement of Optionee under any written employment agreement or any confidentiality, noncompetition, non-disparagement, non-solicitation or similar agreement, including the provisions contained in this Agreement, with the Company or any of its affiliates; (v) Optionee has engaged in habitual drug or alcohol abuse as determined by the Company or any of its affiliates in its reasonable discretion; or (vi) Optionee has, without proper legal cause, failed or refused to use good faith efforts to follow the reasonable directions of his or her supervisor and the same continues for fifteen (15) days of receipt by Optionee of written notice of the same. In addition, the Company shall have a right and option (but not an obligation) to repurchase from such Optionee (or his or her successors or assigns, if any), all (but not less than all) of the Exercise Shares previously acquired by such Optionee as a result of an exercise of the Option, and the purchase price to be paid by the Company upon the exercise of such repurchase option shall be a cash purchase price equal to the lesser of (A) the price paid for such Exercise Shares by Optionee or (B) the Current Fair Market Value of such Exercise Shares (as defined below), and further, such right and option of the Company to repurchase such Exercise Shares shall be exercisable by the Company (at its option) at any time within 180 days following the date of termination of such Optionee's employment by providing written notice to such Optionee. In the event the Company properly exercises its option to repurchase such Exercise Shares, and Optionee refuses to

participate in the resale thereof to the Company (by refusing to provide such documentation as the Company may reasonably request), then (x) the Company may set aside the purchase price for such Exercise Shares, and as of the date it does so, such Exercise Shares shall no longer be deemed to be outstanding and Optionee's sole right with respect thereto will be to collect the purchase price for such Exercise Shares, and (y) Optionee hereby unconditionally and irrevocably agrees to indemnify, defend and hold harmless the Company and its affiliates (including all owners, directors and officers) from and against any claim, loss, damage or expense (including without limitation attorneys' fees and expenses and court costs) incurred by the Company and such other indemnified parties as a result of Optionee's failure to abide by the obligations set out in this clause.

(b)     *Termination of employment without Cause, other than on Qualified Retirement and other than as a result of Disability or death.* If such employment was terminated by the Company without Cause, or by Optionee for any reason, other than in connection with a Qualified Retirement or as a result of Disability or death of Optionee, then Optionee shall have a right and option (but not an obligation) to exercise this Option for all unexercised Exercise Shares that have vested on or before the date of employment termination, and the exercise period therefor shall expire on the 30th day following the effective date of employment termination (after which, the Option shall no longer be exercisable and all further vesting of the Option shall terminate, lapse and be forfeited).

(c)     *Termination without Cause as a result of Qualified Retirement.* If such employment was terminated as a result of a "Qualified Retirement" (as defined below) of Optionee, then such Optionee shall have a right and option (but not an obligation) to exercise this Option to purchase all Exercise Shares that have vested on or before the date of employment termination (and no more), and the exercise period as defined by Section 1 (d) therefor shall be extended until the second annual anniversary (i.e., two years) after the effective date of employment termination of such Optionee (after which it shall terminate, lapse and be forfeited). As used herein, "Qualified Retirement" of an Optionee shall mean termination of employment at the election of Optionee (that does not involve a termination for "Cause" by the Company) but only where such Optionee either (i) both has attained the age of fifty-five (55) and has at least ten (10) years of continuous service with the Company and/or its affiliates or predecessors, or (ii) both has attained the age of sixty (60) and has at least five (5) years of continuous service with the Company and/or its affiliates or predecessors. The Board of Directors of the Company shall have broad authority to make any interpretations and determinations and/or take any actions with respect to all matters involving a Qualified Retirement for the above purposes.

(d)     *Termination as a result of death or Disability of Optionee.* If such employment terminates as a result of Optionee's death or Disability (as defined below) at a time when this Option or any portion thereof remains exercisable, then (notwithstanding the vesting schedule set out above in this Agreement) such Optionee shall have a right and option (but not an obligation) to exercise this Option to purchase a number of Exercise Shares equal to the greater of (x) the number of Exercise Shares that have actually vested and are exercisable as of the date of Optionee's death or Disability or (y) the number of Exercise Shares determined by application of the following formula:

(x)     the total number of Exercise Shares that may be acquired pursuant to this Agreement (whether then vested or not vested) shall be multiplied by a fraction, the numerator of which is the number of months that have elapsed since the month in which

3

this Agreement is entered into up to and including the earlier to occur of (A) the month in which the final Vesting Date occurs or (B) the month in which such Optionee's employment terminated as a result of death or Disability, and the denominator of which is the number of months beginning on the month in which this Agreement is entered into and continuing up to and including the month in which the final Vesting Date occurs (i.e., the fraction included in this clause (x) cannot be greater than one (1))];

(y)  minus the number of Exercise Shares already previously acquired by Optionee pursuant to this Option.

The exercise period as defined by Section 1 (d) therefor shall be extended until twelve (12) months after the effective date of employment termination resulting from such Optionee's death or Disability (after which it shall terminate, lapse and be forfeited). As used in this Agreement, the term, "Disability," means and includes Optionee being unable to comply with his or her duties and obligations to the Company for sixty (60) consecutive days or for an aggregate of ninety (90) days within a given period of one hundred eighty (180) consecutive days as determined by the Board of Directors of the Company as a result of his or her physical or mental incapacity. The Board of Directors of the Company shall have broad authority to make any interpretations and determinations and/or take any actions with respect to all matters involving Disability for the above purposes. In the event of Optionee's death, Optionee's rights under this Agreement may be exercised by Optionee's estate representative(s), so long as the Company is provided documentation acceptable to the Company as to the authority of such representative(s) to act on behalf of Optionee's estate.

3.  **Exercise of Option.** The shares of Common Stock or any other shares or other units of stock or other securities or property, or any combination thereof then receivable upon exercise of the Option, as adjusted from time to time, are sometimes referred to hereinafter as "Exercise Shares." Whenever this Option may be exercised by Optionee by the terms of this Agreement, the Option may be exercised upon delivery on any business day to the Company at its address set forth below (or such other address of the Company, if any, as shall theretofore have been designated by the Company by written notice to Optionee) of the following:

(a)  a completed and executed Notice of Option Exercise in the form set forth in Appendix A attached hereto and made a part hereof;

(b)  a copy of the Special Buy-Sell Agreement, executed by Optionee, substantially in the form of Exhibit A, attached hereto and made a part hereof (as the same may be amended or modified by the Company from time to time for all similarly-situated optionees prior to the exercise of the Option, the "Special Buy-Sell Agreement"); provided, however, that if such Special Buy-Sell Agreement has been previously executed and delivered to the Company by Optionee and is then currently in effect with respect to Optionee, then another copy of the Special Buy-Sell Agreement is not required to be delivered in connection with the delivery of the Notice of Option Exercise); and

(c)  payment of the full Exercise Price for the number of Exercise Shares set forth in the Notice of Option Exercise, in lawful money of the United States of America, by a check made payable to the order of the Company representing good funds.

**4.    Issuance of Exercise Shares; Delivery of Stock Certificate.**  The Company shall, within forty-five (45) days (or as soon thereafter as is practicable) of the exercise of this Option, issue in the name of and cause to be delivered to Optionee one or more certificates representing the Exercise Shares to which Optionee shall be entitled upon such exercise under the terms hereof. Such certificate or certificates shall be deemed to have been issued and Optionee shall be deemed to have become the record holder of the Exercise Shares as of the date of the proper exercise of this Option.  If, upon the exercise of this Option, there shall be payable by the Company any amount for tax withholding, the Company shall have the right to require Optionee to pay the amount of such taxes immediately, upon notification from the Company, before a certificate for the Shares purchased is delivered to Optionee pursuant to such Option. Furthermore, the Company may elect to deduct such taxes from any other amounts then payable to Optionee in cash or in Common Stock or from any other amounts payable any time thereafter to Optionee.

**5.    Exercise Shares Fully Paid and Non-assessable.**  The Company agrees and covenants that all Exercise Shares issuable upon the proper exercise of the Option will, upon issuance of a certificate therefor in accordance with the terms hereof, be duly authorized, validly issued, fully paid and non-assessable and free and clear of all taxes (other than taxes which, pursuant to this Agreement, the Company shall not be obligated to pay) or liens, charges, and security interests created by the Company with respect to the issuance thereof.  For the avoidance of doubt, Optionee confirms and agrees that the Exercise Shares shall be subject to the provisions of the Special Buy-Sell Agreement.

**6.    Reservation of Exercise Shares.**  At the time of or before taking any action which would cause an adjustment pursuant to this Agreement increasing the number of shares of capital stock constituting the Exercise Shares, the Company will take any corporate action which may be necessary in order that the Company have remaining, after such adjustment, a number of shares of such capital stock unissued and unreserved for other purposes sufficient to permit the exercise of all the then vested Options under this Agreement of like tenor immediately after such adjustment. The Company will also from time to time take action to increase the authorized amount of its capital stock constituting the Exercise Shares if at any time the number of shares of capital stock authorized but remaining unissued and unreserved for other purposes shall be insufficient to permit the exercise of the Options under this Agreement then vested. The Company may but shall not be limited to reserve and keep available, out of the aggregate of its authorized but unissued shares of capital stock, for the purpose of enabling it to satisfy any obligation to issue Exercise Shares upon exercise of Options, through the Termination Date, the number of Exercise Shares deliverable upon the full exercise of this Option. At the time of or before taking any action which would cause (pursuant to the provisions of this Section 6) an adjustment resulting in a reduction of the Exercise Price below the then par value (if any) of the Exercise Shares issuable upon exercise of the Options, the Company will take any corporate action which may be necessary in order to assure that the par value per share of the Exercise Shares is at all times equal to or less than the Exercise Price per share and so that the Company may validly and legally issue fully paid and non-assessable Exercise Shares at the Exercise Price, as so adjusted. The Company will also from time to time take similar action if at any time the Exercise Price is below the then par value of the Exercise Shares.

**7.    Fractional Shares.**  The Company may, but shall not be required to, issue fractional shares of capital stock upon the exercise of this Option or to deliver stock certificates which evidence fractional shares of capital stock.  In the event that any fraction of an Exercise Share would, except for the provisions of this Section, be issuable upon the exercise of this Option,

5

the Company may either permit the issuance of such fractional shares or, in lieu thereof, pay to Optionee an amount in cash equal to such fraction multiplied by the Current Market Value (as defined herein) of the Exercise Share. For purposes of this subparagraph, the "Current Market Value" shall mean a value determined in good faith in any reasonable manner as may be prescribed by the Board of Directors of the Company.

8. **Payment of Taxes.** The Company will pay all documentary stamp taxes, if any, attributable to the issuance of Exercise Shares upon the exercise of this Option; provided, however, that the Company shall not be required to pay any tax or taxes which may be payable in respect of any transfer involved in the issue of any certificates representing the Exercise Shares in a name other than that of Optionee, and the Company shall not be required to issue or deliver such certificates unless or until the person or persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid. Optionee is solely responsible for filing all relevant documentation that may be required of Optionee in relation to his or her participation in the Option, such as but not limited to personal income tax returns or any reporting statements in relation to the grant, holding, vesting, or exercise of the Option, the holding of Option Shares, the subsequent sale of Option Shares, and the receipt of any dividends.

9. **Rights of Optionee.** The Optionee shall not, by virtue of anything contained in this Agreement or otherwise, be entitled to any right whatsoever, either in law or equity, of a stockholder of the Company, including without limitation, the right to receive dividends or to vote or to consent or to receive notice as a shareholder in respect of the meetings of shareholders or the election of directors of the Company or any other matter, with respect to any Exercise Shares prior to the acquisition of such Exercise Shares on the exercise of this Option as provided in this Agreement.

10. **Adjustment of Exercise Shares and Exercise Price.** The Option, the Exercise Price and the number and kind of Exercise Shares purchasable upon the exercise of this Option shall (and then only if the Option is then exercisable) be subject to adjustment from time to time upon the happening of certain events as provided in this Section 10.

(a) In the case the Company shall (i) pay a dividend or make a distribution on its shares of Common Stock in shares of Common Stock, (ii) subdivide or classify its outstanding Common Stock into a greater number of shares or (iii) combine or reclassify its outstanding Common Stock into a smaller number of shares, the Exercise Price and Exercise Shares in effect at the time of the record date for such dividend or distribution or of the effective date of such subdivision, classification, combination or reclassification shall be proportionally adjusted so that Optionee, upon any exercise of this Option immediately thereafter shall be entitled to receive the aggregate number and kind of shares which, if this Option had been exercised by such Optionee immediately prior to such date, he would have owned upon such exercise and been entitled to receive upon such dividend, subdivision, classification, combination or reclassification, all as reasonably determined by the Board of Directors of the Company in its discretion. For example, if the Company declares a 2 for 1 stock dividend or stock split and the Exercise Price immediately prior to such event was $5.00 per share, the adjusted Exercise Price immediately after such event would be $2.50 per share, and as a result, the number of Option Shares would double. Such adjustment shall be made successively whenever any event listed above shall occur.

6

(b)     If there shall be (x) a merger or consolidation of the Company or a share exchange relating to the outstanding shares of capital stock of the Company, such that, immediately after such merger, consolidation or share exchange, the holders of the shares of capital stock of the Company immediately prior to such sale no longer control a majority in interest of the shares of capital stock of the organization surviving such merger, or the organization resulting from such consolidation, or (in the case of such a share exchange) of the Company, or (y) a sale of the Company's properties and assets as, or substantially as, an entirety to any other person (other than to a wholly-owned subsidiary of the Company) (in each case, herein referred to as a "Corporate Transaction"), then, in the discretion of the Board of Directors of the Company, the Option Shares subject to this Option at the time of a Corporate Transaction that are not otherwise vested may automatically vest. Unless the Company's Board of Directors determines otherwise (in its discretion), no such accelerated vesting of the Option Shares, however, shall occur if and to the extent this Option is, in connection with the Corporate Transaction, either to be assumed by the successor corporation (or parent thereof) or to be replaced with a comparable option to purchase shares of the capital stock of or other equity interests in the successor organization (or parent thereof). The determination of option comparability shall be made by the Board of Directors of the Company, and its determination shall be final, binding and conclusive.

(i)     At the election of the Company, following the Corporate Transaction, this Option shall terminate and cease to be outstanding, except to the extent assumed by the successor organization (or parent thereof) in connection with the Corporate Transaction.

(ii)     If this Option is assumed in connection with a Corporate Transaction, then this Option shall be appropriately adjusted, immediately after such Corporate Transaction, to apply to the number and class and type of securities which would have been issuable to Optionee in connection with the consummation of such Corporate Transaction had this Option been exercised immediately prior to such Corporate Transaction, and appropriate adjustments shall also be made to the Exercise Price provided the aggregate Exercise Price for the exercise of all such securities combined shall remain the same. The Company may also condition the exercise of the Option in connection with the Corporate Transaction, and/or the continuity of the Option following any Corporate Transaction, on such conditions as other shareholders of the Company are required to be subject to, and on such conditions as the successor organization (or its parent) in any such Corporate Transaction may require in connection with the offer, issuance and exercise of options for equity securities issued to its employees.

(iii)     For the avoidance of doubt, this Agreement shall not in any way limit the right of the Company to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate or sell or transfer all or any part of its business or assets.

(c)     Whenever the Exercise Price payable upon exercise of this Option is adjusted pursuant to the provisions of (a) above, the number of Exercise Shares purchasable upon exercise of this Option shall simultaneously be adjusted by multiplying the number of Exercise Shares initially issuable upon exercise of this Option by the Exercise Price in effect on the date hereof and dividing the product so obtained by the Exercise Price, as adjusted, or as the Company shall otherwise determine is equitable and fair.

(d)     No adjustment in the Exercise Price shall be required unless such adjustment would require an increase or decrease of at least one cent ($0.01) in such price; provided, however, that any adjustments which by reason of the provisions of this sentence are not required to be made shall be carried forward and taken into account in any subsequent adjustment required to be made hereunder. All calculations under this Section 10 shall be made to the nearest cent or to the nearest one-hundredth of a share, as the case may be.

(e)     The Company may, but shall not be required to, retain a firm of independent certified public accountants selected by the Board of Directors (who may be the regular accountants employed by the Company) to make any computation required by this Section 10, and a certificate signed by such firm (or by the Company if calculations provided by the Company) shall be conclusive evidence of the correctness of such adjustment.

(f)     In the event that at any time, as a result of an adjustment made pursuant to this Section 10, Optionee thereafter shall become entitled to receive any Exercise Shares of the Company other than Common Stock, thereafter the number of such other shares so receivable upon exercise of this Option shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions with respect to the Common Stock contained in this Section 10, as determined by the Company to be equitable and fair.

11.     **Restrictions on Exercise and Transferability.**  This Option, and the rights of Optionee under this Agreement, shall be exercisable only by Optionee, and shall not be transferred or assigned to any other party other than by a beneficiary designation made in a form and manner acceptable to the Company, or by will or the applicable laws of descent and distribution.

12.     **Restrictive Legends.**  So long as an exemption therefrom is then available, the Company shall not be required by the terms of this Agreement to register, under the Securities Act of 1933, as amended (the "Act"), or under applicable state securities laws (together with the Act, the "Securities Laws"), any of the Exercise Shares issued or to be issued upon the exercise of the Option. In addition, in the event that any such Exercise Shares are not so registered, Optionee consents to the placement on the certificate or certificates representing such Exercise Shares a legend or legends to the effect that, among other things, neither such certificate or certificates nor the Exercise Shares evidenced thereby have been registered under any Securities Laws and that no sale, transfer or other disposition thereof or any interest therein may be made or shall be recognized unless in the satisfactory written opinion of counsel for, or satisfactory to, the Company, such transaction would not violate or required registration under such Securities Laws. The Company may also place on such certificate or certificates any other legend it deems necessary or desirable in order to conform to any of the Securities Laws.

13.     **Covenants of Optionee.**

(a)     _Non-competition; Non-Solicitation of Customers and Optionees._

(i)     During the term of this Agreement and for a period of eighteen (18) months from the termination of Optionee's employment with the Company (the "Termination Date"), Optionee shall not, directly or indirectly, as a partner, joint venturer, employer, employee, contractor, consultant, member, manager, shareholder, director, officer, trustee, principal or agent engage in, control, advise with respect to, manage, act as a consultant to,

8

receive any economic benefit from or exert any influence upon any business or businesses engaged in the Business in the states where the Company or its affiliates or their predecessors have previously operated, currently operate, or contemplate operating in the reasonably foreseeable future as of the Termination Date; provided, that Optionee may, without violating this covenant own as a passive investment not in excess of five percent (5%) of the securities of a corporation which engages in the Business if such securities are publicly traded on a national securities exchange or in the over-the-counter market. As used herein, the term "Business" means offering, marketing, providing, selling or reselling or otherwise being involved in any of the following: (A) WiFi-first and/or WiFi primary smartphone services that rely on unlicensed frequency as a primary method of connectivity; (B) LTE radio network access buildout and/or operations for private use (also known as "Private LTE") which can include First Net Bands, Citizens Band and/or unlicensed frequencies for use by educational school systems (including college and university campuses), rural entities with access to LTE Band 14 frequency and enterprise customers who maintain campus and/or multiple location presence, (C) mobile network operator certification of applications and devices (including those for smartphones and IoT applications and devices), (D) delivery and/or customization of voice services involving enhanced signaling information designed for use by IP Multimedia Subsystem (IMS) application servers, (E) customized 8YY and DID services delivered to contact centers, and (F) use of database access technology to simulate Rich Communication Services (RCS) or Universal Profile based services, as those terms are commonly referred to in the cellular phone service and related industries.

(ii)     During the term of this Agreement and for a period of eighteen (18) months from and after the Termination Date, Optionee shall not encourage or assist or engage or participate in any effort or act to solicit any clients, customers or employees of the Company, its affiliates or their predecessors in interest to cease doing business, or to cease their employment or association, with the Company, its affiliates or their predecessors in interest or interfere in any manner with the contractual or employment relationship between the Company, its affiliates or their predecessors in interest and any such client, customer or employee.

(b)     _Confidential Information; Ownership of Intellectual Property._

(i)     During Optionee's employment, Optionee will have access to, obtain and may prepare Confidential Information. As used in this Agreement, "Confidential Information" means confidential information of the Company, its affiliates and their predecessors, which is defined as secrets, customer lists and credit records, employee data, sales representatives and their territories, mailing lists, consultant arrangements, pricing policies, unique or proprietary operational methods, marketing plans or strategies, product development techniques or plans, research and development programs or plans, business acquisition plans, new personnel acquisition plans, designs and design projects, any proprietary rights (unless previously publicly disclosed in a manner which would not and does not constitute a breach of this Agreement or any other relevant agreement) and any other research or business information of the Company, its affiliates or their predecessors, which any of those parties treat as confidential (whether or not a trade secret under applicable law); provided, however, that Confidential Information shall not extend to (x) information now generally known or available to the public or which becomes known or

9

available other than as a result of the breach of an agreement by Optionee or (y) information known by or in the possession of Optionee prior to being disclosed by the Company, its affiliates or any of their predecessors and which was known or possessed by Optionee as a result of activities unrelated to Optionee's services to the Company, its affiliates or their predecessors. Optionee acknowledges that the Company, its affiliates and their predecessors have expended considerable time, effort and expense developing and safeguarding its Confidential Information. Optionee also acknowledges that Confidential Information is the sole and exclusive property of the Company, its affiliates and their predecessors and that one or more of those parties have undertaken reasonable measures to maintain the secrecy of such Confidential Information. Therefore, during the period of Optionee's employment and thereafter, Optionee shall not disclose or cause to be disclosed either directly or indirectly, in whole or in part, any Confidential Information except as may be necessary to perform his or her duties for the Company or its affiliates and as may be required by law, and shall exercise the highest degree of care in safeguarding Confidential Information against loss, theft, or other inadvertent disclosure; provided, however, if Optionee is required by law to disclose any Confidential Information, prior to disclosing any such Confidential Information, Optionee shall promptly notify the Company in writing of such requirement so that it may seek an appropriate protective order or other appropriate remedy or waive compliance with the provisions of this clause (b).

(ii)     Optionee agrees that the Company shall own, and Optionee agrees to assign and does hereby assign, all right, title and interest (including patent rights, copyrights, trade secret rights, mask work rights, trademark rights, and all other intellectual and industrial property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designs, know-how, ideas and information authored, created, contributed to, made or conceived or reduced to practice, in whole or in part, by Optionee that relate directly or indirectly to the Business during his employment with the Company, its affiliates and their predecessors which either (A) relate, at the time of conception, reduction to practice, creation, derivation or development, to the Company's or its affiliates' or their predecessors' businesses or actual or anticipated research or development, or (B) were developed on any amount of the Company's or its affiliates' or their predecessors' time or with the use of any of their equipment, supplies, facilities or trade secret information (all of the foregoing collectively referred to herein as "Company Intellectual Property"), and Optionee will promptly disclose all Company Intellectual Property to the Company. All of Optionee's works of authorship and associated copyrights created during Optionee's employment and in the scope of Optionee's employment that relate directly or indirectly to the Business shall be deemed to be "works made for hire." Optionee agrees to perform, during and after his employment, all reasonable acts deemed necessary by the Company to assist the Company and its affiliates, at the Company's expense, in obtaining and enforcing its rights throughout the world in the Company Intellectual Property. Such acts may include, but are not limited to, execution of documents and assistance or cooperation (x) in the filing, prosecution, registration, and memorialization of assignment of any applicable patents, copyrights, mask work, or other applications, (y) in the enforcement of any applicable patents, copyrights, mask work, moral rights, trade secrets, or other proprietary rights, and (z) in other legal proceedings related to the Company Intellectual Property.

10

(iii)    Nothing herein is intended to limit rights of the Company under any statute or the common law concerning the use, ownership and disclosure of intellectual property, confidential information and/or trade secrets.

(c)    *Disparaging Comments Prohibited*.  During and after Optionee's employment, the parties (which, with respect to the Company and its affiliates, shall be limited to their respective officers and directors) agree that no party hereto shall make any disparaging comments about any other party, or, in the case of Optionee, the Company and all affiliates of the Company or any of their respective members, owners, managers, directors, officers or employees, which may tend to impugn or injure their respective reputation, goodwill and relationships with their past, present and future customers, employees, vendors and with the business community generally; provided, however, that nothing in this Agreement shall prohibit either party from providing accurate information to any court, governmental entity, person or organization in response to legal process, in connection with the assertion of any administrative or judicial claim, or as required by law.

(d)    *Breach of Restrictive Covenants*.

(i)    Optionee acknowledges that the restrictions contained in this Section 13, in view of the nature of the Company's and its affiliates' businesses, are reasonable and necessary to protect the Company's and the Company's legitimate business interests and that any violation of Section 13 would result in irreparable injury to the Company and/or its affiliates.  Optionee further acknowledges that the remedy at law for any breach or threatened breach by them of the agreements contained in Section 13 will be inadequate and agree that the Company and/or its affiliates, in the event of such breach or threatened breach, in addition to all other remedies available for such breach or threatened breach (including a recovery of damages), will be entitled to obtain injunctive relief without being required to prove actual damages or post bond and, to the extent permitted by applicable statutes and rules of procedure, a temporary restraining order (or similar procedural device) upon the commencement of such action.  Section 13, and each individual section, clause or subclause thereof, constitutes an independent and severable covenant and if any or all of the provisions of Section 13 are held to be unenforceable for any reason whatsoever, it will not in any way invalidate or affect the remainder of this Agreement which will remain in full force and effect.  The parties intend for the covenants of Section 13 to be enforceable to the maximum extent permitted by law, and if any reviewing court deems any such covenants to be unenforceable or invalid, Optionee and the Company authorize such court to reform the unenforceable or invalid provisions and to impose such restrictions as reformed and the remaining provisions as it deems reasonable.

(ii)    The existence of any cause of action Optionee may have against the Company or its affiliates shall not constitute a defense to enforcement of this Section 13.

(iii)    In the event of a conflict between the provisions of any obligation of Optionee set out in this Section 13, and any other instrument or agreement by which Optionee is bound involving the Company, the provisions of this Section 13 shall be deemed to be an addition to, and not a limitation upon, the effect and enforceability of such conflicting provisions found in any other instrument or agreement involving the Company.

(e) *Survival*. The provisions of this Section 13 shall survive termination of this Agreement and exercise of the Option for the periods set out in this Section 13. and if no such period is identified with respect to any particular right or obligation of a party, then indefinitely.

**14. Miscellaneous.**

(a) *No Tax Advice*. The Optionee acknowledges and agrees that the neither the Company nor any person or other party on its behalf has made any warranties or representations to Optionee with respect to the income tax consequences of the issuance of the Option, or the exercise of the Option (or any portion thereof) by Optionee (including, without limitation, with respect to the making of an election under Section 83(b) of the Code), and Optionee is in no manner relying on the Company or its representatives for an assessment of such tax consequences. The Optionee is advised to consult with Optionee's own tax advisors with respect to such tax consequences and Optionee's ownership of the Exercise Shares.

(b) *Notices*. All notices or other communications under or relating to this Agreement shall be in writing and shall be deemed to have been given if delivered by hand or mailed by certified mail, postage prepaid, return receipt request, addressed as follows:

If to the Company:

Evolve Cellular Inc.
Attn: President
1250 S Capital of Texas Hwy B2-235
West Lake Hills, TX 78746

If to Optionee:

Alan Berrey

67 Woodward Ln
Boxborough, MA 01719

Either of the Company or Optionee may from time to time change the address to which notices to it are to be mailed hereunder by notice in accordance with the provisions of this Section.

(c) *Amendments*. This Agreement may be amended or supplemented only by a writing signed by both parties hereto.

(d) *Successors and Assigns*. Subject to the provisions of Section 14 hereof, this Agreement shall inure to the benefit of and be binding on the respective successors, assigns and legal representatives of Optionee and the Company.

(e) *Severability*. If for any reason any provision, paragraph or terms of this Agreement is held to be invalid or unenforceable, all other valid provisions herein shall remain in full force and effect and all terms, provisions and Sections of this Agreement shall be deemed to be severable.

**(f) *Governing Law; Jurisdiction*. To the full extent controllable by stipulation of the Company and Optionee, this Agreement shall be interpreted and enforced under Texas law, without giving effect to the principles of conflicts of laws thereof. The parties hereto irrevocably agree that any dispute or disagreement arising under or relating to this Agreement shall be brought exclusively in the federal or state courts located in Travis County, Texas, and each party irrevocably submits to the jurisdiction of such courts for such purposes; provided, however, that any judgement properly rendered in such courts may also**

be enforced by an action brought against the non-prevailing party in any additional court with jurisdiction over such non-prevailing party.

(g) *Headings*. Headings used herein are included herein for convenience of reference only and shall not affect the construction of this Agreement or constitute a part of this Agreement for any other purpose.

(h) *No Guarantee of Continued Service*. EMPLOYEE ACKNOWLEDGES AND AGREES THAT THE VESTING OF SHARES PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY CONTINUING AS AN EMPLOYEE AT THE WILL OF THE COMPANY (NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THIS OPTION OR ACQUIRING SHARES HEREUNDER). EMPLOYEE FURTHER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS AN EMPLOYEE FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND SHALL NOT INTERFERE IN ANY WAY WITH EMPLOYEE'S RIGHT OR THE COMPANY'S RIGHT TO TERMINATE EMPLOYEE'S RELATIONSHIP AS AN EMPLOYEE AT ANY TIME, WITH OR WITHOUT CAUSE. THIS OPTION IS 1) NOT CONSIDERED SALARY, NOR IS IT A PROMISE FOR FUTURE GRANTS OF OPTIONS, 2) NOT A TERM OR CONDITION OF EMPLOYMENT WITH THE COMPANY, AND 3) MADE AT THE SOLE DISCRETION OF THE COMPANY.

(i) *Miscellaneous*. The Agreement may be executed in counterparts, by facsimile or electronic signatures or otherwise, each of which shall be deemed to be an original and all or both of which shall constitute one and the same instrument. No party is bound by the terms and provisions of this Agreement until all parties hereto have executed and delivered a counterpart hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Non-Qualified Stock Option and Related Agreement to be duly executed the day and year first set out above.

"Company"       **EVOLVE CELLULAR INC.**

By: *Lowell Feldman*
Lowell Feldman, President

"Optionee"       Alan E Berrey
*[Print Name of Optionee]*

*[Signature of Optionee]*

13

## APPENDIX A

### NOTICE OF STOCK OPTION EXERCISE

Pursuant to that certain Non-Qualified Stock Option and Related Agreement, dated as of _____ 201_, as amended to date (the "Agreement"), by and between Evolve Cellular Inc., a Texas corporation (the "Company"), and the undersigned party, and subject to the vesting periods and other provisions set forth therein, the undersigned hereby irrevocably elects to exercise the Option to acquire _____ shares of Common Stock of the Company, at an exercise price of $60.181398050 per share, or an aggregate purchase price of $_____ for all such shares combined. Enclosed herewith is a check representing good funds made payable to the order of the Company in the amount of the aggregate purchase price set forth in the preceding sentence, and an executed original of the Special Buy-Sell Agreement referred to in the Agreement (provided, however, that if such Special Buy-Sell Agreement executed by the undersigned party has previously been provided to the Company and is currently in effect with respect to the undersigned party, then another copy of the Special Buy-Sell Agreement is not required to be delivered in connection with this exercise notice). Each capitalized term used herein, unless otherwise defined, has the meaning given such term in the Agreement.

The undersigned party hereby represents and agrees that the Exercise Shares purchased pursuant hereto are being purchased for investment and not with a view to the distribution or resale thereof, and that the undersigned understands that said Exercise Shares have not been registered under the Securities Laws.

Address of Optionee:

_____

_____

_____

Dated: _____

Name of Optionee: _____

Optionee's Signature: _____

14

# Exhibit B

# EMPLOYMENT AGREEMENT

This Employment Agreement (this "**Agreement**"), dated as of ___March 1___, 2016 (the "**Effective Date**"), by and between Evolve Cellular Inc., a Texas corporation (the "**Company**"), and Alan Berrey (the "**Employee**");

W I T N E S S E T H:

WHEREAS, the Company desires to employ the Employee pursuant to the terms and conditions set forth herein and the Employee wishes to be employed by the Company on such terms and conditions;

WHEREAS, the Employee will be a key employee of the Company, with significant access to information concerning the Company, its direct and indirect subsidiaries and their respective affiliates, and each of their respective businesses; and

WHEREAS, the disclosure or misuse of such information or the engaging in competitive activities would cause substantial harm to the Company, its direct and indirect subsidiaries and their respective affiliates, and each of their respective businesses;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      **Agreement to Employ; Term.**  Upon the terms and subject to the conditions of this Agreement, the Company hereby employs the Employee and the Employee hereby accepts employment by the Company.  The Employee's term of employment shall commence on the Effective Date, and terminate on the June 30, 2017, unless earlier terminated as set forth herein (the "**Initial Term**"); <u>provided</u>, that, commencing on the   July 1, 2017, and on each anniversary date thereafter, the Term shall automatically be extended (subject to earlier termination, as set forth herein) for one additional year (each a "**Renewal Term**") unless, not later than 30 calendar days prior to the expiration of the Initial Term or any Renewal Term, either the Company or the Employee, in such party's sole discretion gives written notice to the other party of its election not to extend.  The Initial Term and any Renewal Terms shall together be referred to herein as the "**Term**."

2.      **Duties.**  During the Term, the Employee will serve as the Executive Vice President – Business Development of the Company.  The Employee shall have such powers and authority in relation to the business of the Company as are commensurate with his position with the Company.  The Employee will report directly to the President of the Company (the "**President**").  The Employee shall perform such duties as are commensurate with his position and such other duties as may from time to time lawfully be assigned to him by the President.

3.      **Full Time; Reasonable Best Efforts.**  During the Term, the Employee shall promote the interests of the Company and shall devote his full working time and reasonable best efforts to the performance of his duties, services and responsibilities hereunder, except for reasonable periods of absence due to vacation, sickness, injury or other disability, or as otherwise

approved in writing by the President.  The Employee shall not engage in any other activity that could reasonably be expected to interfere with the performance of the Employee's duties, services and responsibilities hereunder.  Employee shall only take actions that are in the best interests of the Company.  Notwithstanding the foregoing, this Agreement shall not be interpreted as prohibiting the Employee from managing his personal affairs or engaging in charitable or civic activities, in each case, so long as such activities do not interfere in any material respect with the performance of his duties and responsibilities hereunder.

      **4.**      **Compensation and Benefits.**  During the Term, the Employee shall be entitled to compensation and benefits as follows:

      **(a)**      **Base Salary.**  The Employee will receive a base salary at the rate of described under the terms of Exhibit A, payable in equal increments in a manner consistent with the Company's payroll practices (the "**Base Salary**").

      **(b)**      **Employee Bonus.**  For the term of this Agreement, the Employee will be eligible for a performance bonus as set out on **Exhibit A** attached hereto and made a part hereof. For subsequent terms the Employee shall be eligible for a bonus during each year of employment with the Company with a target bonus (determined by the Company) based upon revenue secured with the help of Employee (the "**Annual Bonus**").  Each such bonus shall be based upon the achievement of performance goals, which performance goals will be established annually by the Company.  The actual level of payment will be subject to the terms of the Company's annual incentive plan and depend on the level of achievement of the applicable performance goals.  Except as provided in Section 6(c)(iii), the Employee must be employed in good standing on the date the Annual Bonus is paid (which shall be paid in the calendar year following the completion of the applicable year no later than 30 days following completion of the audit by the Company's independent accountants of its financial statements for such fiscal year) in order to earn the Annual Bonus.  The Board or the Compensation Committee shall determine in good faith the amount of the Annual Bonus earned under this Agreement, and such determination shall be final and binding.

      **(c)**      **Option Award.**  The Employee may be awarded a grant of non-qualified stock options  in the discretion of the Company.  The number of shares of common stock underlying the options and the other terms and provisions of such grant, if any, will be set out in a separate written agreement which may be approved by the full Board of Directors of the company. At the time this agreement is being offered, it is anticipated that there will be approximately 470,000 common shares and zero preferred shares representing 100% of the equity ownership of the company.  The targeted price per share will be approximately $60.20 at closing of the anticipated merger between Scratch and Evolve Cellular.  Lowell Feldman, who will be Chairman of the Board of Directors, and as an individual, believes a target amount of shares appropriate for this agreement would be 10,000 shares vesting over a period this agreement with a strike price of $60.20.  Mr. Feldman, however, desires to defer all specific and final terms related to any grant of non-qualified stock options to the entire Board of Directors.

      **(d)**      **Benefits.**  The Employee shall be entitled to participate in Company benefit plans that are generally available to the Company's employees in the same manner as the Company's employees generally, and in accordance with the then-existing terms and conditions of such plans. Nothing in this Agreement shall prevent the Company or any of its direct or indirect

subsidiaries from modifying any benefit plan. The company will provide information about the full Benefits to the Employee as soon as practicable.

(e)     **Vacation.**  The Employee shall be entitled to fifteen (15) days of paid vacation time per annum in accordance with Company policy.

(f)     **Travel, Commuting and Living Expenses.**  During the Term, if the Company provides an office for Employee within 30 miles of Acton, Massachusetts, then Employee shall provide his services under this Agreement at that location.  If the Company does not provide such an office, Employee shall provide his services under this Agreement at his home or another location acceptable to the Company.  In addition, as part of his services, Employee shall (at the request of the Company) travel approximately four to six weeks each year, with most of the travel occurring to Austin, Texas.  The Company shall reimburse the Employee for his reasonable travel expenses for intermittent trips to Austin, Texas.  Reimbursement of travel expenses will be subject to the Employee's compliance with the Company's expense reimbursement policies in effect from time to time.  To the extent possible, all travel should be arranged and approved at least two weeks prior to the intended travel date, and the Company agrees to act reasonably in determining when such travel shall be required.  Further, Employee shall be required to request non-travel dates and vacation dates as far in advance as practicable given Employee's circumstances, which dates shall be subject to the reasonable advance approval of the Company.

(g)     **Expenses**.  The Employee will be entitled to reimbursement of all reasonable out-of-pocket expenses incurred in the ordinary course of business on behalf of the Company in accordance with Company policies and only with the Company's advance written consent, determined in its sole discretion.

(h)     **Withholding.**  The Company may withhold from compensation payable to the Employee all applicable federal, state and local withholding taxes and any other amounts required by law.

5.     **Restrictive Covenants**.  The Employee shall comply with his obligations under the Confidentiality and Non-Competition Agreement, dated on or about the date hereof, by and between the Company and the Employee.

6.     **Termination.**

(a)     **General**.  The Employee's employment with the Company and the Term may be terminated at any time by the Company with or without Cause (as defined below) or due to the Employee's Disability upon written notice to the Employee or in the event of the death of the Employee.  The Employee's employment with the Company and the Term may also be terminated by the Employee (i) for Good Reason or (ii) after at least 30 days' prior written notice thereof from the Employee to the Company, without Good Reason; provided that, if the Employee resigns without Good Reason, at Company's sole discretion, Company may elect to accelerate the date of termination of the Employee's employment to any date within the notice period.  Upon termination of the Employee's employment for any reason, the Employee shall be deemed to have resigned from all offices and directorships then held with the Company and each of its direct and indirect subsidiaries and each of their respective affiliates.

**(b)** **Definitions**. As used herein, the following terms shall have the following meanings:

"**Cause**" means any of the following: (i) the Employee's (A) commission of a felony, or (B) being convicted of or pleading guilty or nolo contendere to a misdemeanor where imprisonment is imposed, other than for a traffic-related offense, (ii) any act of material misconduct or gross negligence by the Employee in the performance of the Employee's duties relating to his employment, (iii) the Employee's commission of any act of theft, fraud or material dishonesty that could cause economic injury to the Company or its affiliates or any act of moral turpitude by the Employee, (iv) the Employee's failure to perform any duties reasonably assigned to him by the President of the Company or the Employee's refusal or failure to follow the lawful directives of the President, in each case after written notice from the Company of, and 10 calendar days for the Employee to cure, such refusal or failure, (v) any material breach by the Employee of this Agreement, the Non-Competition Agreement, any material Company policy, or any other material written agreement executed by the Employee with the Company or any of its direct or indirect subsidiaries or any of their respective affiliates that is not cured within 10 calendar days following written notice of such breach, and (vi) Employee's unlawful appropriation of a material corporate opportunity.

"**Disability**" means illness (mental or physical) or accident that results in the Employee being unable to perform the Employee's duties as an employee of the Company, after the Company affords the Employee legally required accommodations for such disability, for a period of 90 consecutive days or for a total period of 120 days, whether or not consecutive, in any 12-month period.

"**Good Reason**" means the occurrence of any of the following during the Employee's employment with the Company without the Employee's consent:  (i) a material diminution of the Employee's title, responsibilities, duties or authority; (ii) any material reduction in Base Salary or target bonus percentage; (iii) any material breach by the Company of this Agreement.  To constitute Good Reason, the Employee must give written notice to the Company within 15 days of any Good Reason event (the "**Good Reason Notice**")The Company shall have 30 days to cure such event following receipt of the Good Reason Notice and the Employee's employment must terminate within 15 days following the expiration of the Company's applicable cure period for such applicable event.

**(c)** **Effects of Termination**.

**(i)** In the event of the termination of the Employee's employment, promptly after the date of such termination, the Company shall make a lump-sum payment to the Employee (or in the event of his death, his estate) on account of:  (A) any Base Salary that had accrued but had not been paid prior to such date of termination; (B) up to a maximum of four weeks of accrued but unused vacation time; and (C) reimbursement for reasonable and documented out-of-pocket business expenses incurred on behalf of the Company through such date of termination (the "**Accrued Amounts**").  In addition, the Employee shall retain any amounts that the Employee is otherwise entitled to retain post-termination under the terms of any benefit plan, policy, practice or program of the Company, subject to the terms and conditions of such plan, policy, practice or program.

4

**(ii)** In the event the Employee resigns employment with the Company without Good Reason or the Company terminates the Employee's employment for Cause, the Employee shall be entitled to receive only the Accrued Amounts.

**(iii)** In the event the Employee's employment is terminated by the Company without Cause or by the Employee for Good Reason, or by the Company electing not to renew any Renewal Term as provided in <u>Section 1</u>, subject to <u>Section 6(d)</u>, in addition to the Accrued Amounts, the Company shall: (A) reimburse the Employee monthly for an amount equal to the Company portion of the Employee's monthly COBRA cost under the Company's health plan (including for his spouse and eligible dependents) for a period of two (2) months following such date of termination (the "**COBRA Payment**"), commencing on the first regularly-scheduled payroll date that occurs on or following the 60th day after the date of termination of the Employee's employment (with any portion of the COBRA Payment that otherwise would have been paid during such 60-day period being made up in the first payment), provided, however, that the COBRA Payment shall be discontinued if the Employee does not elect or becomes ineligible for COBRA, fails to make premium payments on time, or becomes eligible for substantially similar benefits from another employer, (B) for a period of four (4) months following such date of termination, pay the Employee the Base Salary (the "**Severance Amount**"), payable in equal installments in accordance with the Company's normal payroll practices, but no less frequently than monthly, commencing on the first regularly-scheduled payroll date that occurs on or following the 60th day after the date of termination of the Employee's employment (with any payments of Base Salary that otherwise would have been paid during such 60-day period being made up in the first payment), and (C) make a payment to the Employee equal to the product of (x) the Annual Bonus, if any, that the Employee would have earned for the fiscal year in which the date of termination of the Employee's employment occurs based on achievement of the applicable performance goals for such fiscal year and (y) a fraction, the numerator of which is the number of days the Employee was employed by the Company during the fiscal year of termination and the denominator of which is the number of days in such fiscal year (the "**Pro Rata Bonus**") payable on the date that annual bonuses are paid to similarly situated executives.

**(iv)** In the event the Employee's employment with the Company is terminated due to the death or Disability of the Employee, subject to <u>Section 6(d)</u>, in addition to the Accrued Amounts, the Company shall pay the Employee or Employee's estate, as applicable, the Pro Rata Bonus for the year in which termination occurs, on the date that annual bonuses are paid to similarly situated executives.

**(d)** **Conditions and Limitations.** Notwithstanding the foregoing, the Company's obligation to pay the COBRA Payment, the Severance Amount and the Pro Rata Bonus shall be subject to the following provisions and conditions:

**(i)** **Release of Claims**. The Employee (or, in the case of the Employee's death, his executor on the Employee's behalf) must sign and not revoke a general release agreement that becomes effective within 60 days following the date of termination of the Employee's employment, substantially in the form of **Exhibit B** attached hereto and made a part hereof.

(ii)    **Consequences of Breach**.    If the Employee breaches the Employee's obligations under the Non-Competition Agreement, the Company may immediately cease payments of the COBRA Payment, the Severance Amount and the Pro Rata Bonus and may recover any portion of the COBRA Payment, Severance Amount and the Pro Rata Bonus paid to the Employee after the date of such breach.  The cessation and recovery of these payments shall be in addition to, and not as an alternative to, any other remedies at law or in equity available to the Company, including the right to seek specific performance or an injunction.

(e)    **Survival**.  The provisions of <u>Sections 5 through 21</u> of this Agreement shall survive the Term and the termination of Employee's employment, and shall continue thereafter in full force and effect in accordance with their terms.

7.    **Enforceability, etc.**  The terms of this Agreement are intended to be severable and shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision hereof shall be prohibited or invalid under any such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating or nullifying the remainder of such provision or any other provisions of this Agreement.  If any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, such provisions shall be construed by limiting and reducing it so as to be enforceable to the maximum extent permitted by applicable law.

8.    **Notices**.  All notices, demands or other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered in person, by United States mail, certified or registered with return receipt requested, or by a nationally recognized overnight courier service, or otherwise actually delivered: (a) if to the Employee, to the address of the Employee in the Company's payroll records; (b) if to the Company, to the Company at 1250 S. Capital of Texas Hwy., Bldg. 2-235, West Lake Hills, Texas 78746, Attention: President; or (c) at such other address as may have been furnished by such person in writing to the other party.  Any such notice, demand or communication shall be deemed given on the date given, if delivered in person, on the date received, if given by registered or certified mail, return receipt requested or given by overnight delivery service, or three days after the date mailed, if otherwise given by first class mail, postage prepaid.

9.    **Governing Law.  This Agreement, and any contest, dispute, controversy or claim arising hereunder or related hereto (collectively, "Disputes"), shall be governed by and construed in accordance with the internal laws of the State of Texas applicable to agreements made and to be performed in that state, without reference to its principles of conflicts of law that would apply the laws of another jurisdiction.**

10.    **Dispute Resolution**.  **Except as provided in the Non-Competition Agreement, any Dispute must be resolved in accordance with the Company's Arbitration of Disputes agreement, which Employee must execute on or before the date of this Agreement as a condition to the effectiveness of this Agreement.**

11.    **Amendments and Waivers.**  Except as provided in the immediately following sentence, this Agreement may be amended or modified only by a written instrument signed by the Company and the Employee.  No waiver of this Agreement or any provision hereof shall be

binding upon the party against whom enforcement of such waiver is sought unless it is made in writing and signed by or on behalf of such party. The waiver of a breach of any provision of this Agreement shall not be construed as a waiver or a continuing waiver of the same or any subsequent breach of any provision of this Agreement. No delay or omission in exercising any right under this Agreement shall operate as a waiver of that or any other right.

**12.    Binding Effect.**  Neither party may assign this Agreement or any of his or its rights, duties or obligations hereunder, except that the Company shall have the right to assign this Agreement to any parent or subsidiary of the Company with the prior consent of the Employee (not to be unreasonably withheld, delayed or conditioned) or to any person or entity to whom or which all or substantially all of the business of the Company may be transferred. This Agreement shall be binding on and inure to the benefit of the parties hereto and their respective heirs, executors and administrators, successors and assigns.

**13.    Entire Agreement.**  This Agreement, along with the agreement, documents and instruments referred to herein, constitutes the final and entire agreement of the parties with respect to the matters covered hereby and replaces and supersedes all other agreements and understandings with respect to the matters covered hereby.

**14.    Counterparts.**  This Agreement may be executed in any number of counterparts, including counterpart signature pages or counterpart facsimile signature pages, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**15.    No Conflicting Agreements.**  The Employee represents and warrants to the Company that the Employee is not a party to or bound by any confidentiality, noncompetition, non-solicitation, employment, consulting or other agreement or restriction that could reasonably be expected to conflict with, or be violated by, the performance of the Employee's duties to the Company or obligations under this Agreement or the Non-Competition Agreement.

**16.    Captions; Construction.**  The captions of the sections of this Agreement are for convenience of reference only and in no way define, limit or affect the scope or substance of any section of this Agreement. As used herein: (a) reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof; (b) reference to any law, rule or regulation means such law, rule or regulation as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any law, rule or regulation means that provision of such law, rule or regulation from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision; (c) "hereunder," "hereof," "hereto," and words of similar import shall be deemed references to this Agreement as a whole and not to any particular article, section or other provision hereof; (d) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term; (e) "or" is used in the inclusive sense of "and/or"; and (f) references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto.

**17.    Intentionally left blank.**

18.   **Notification of New Employer.**  In the event that the Employee is no longer an employee of the Company, the Employee consents to notification by the Company to the Employee's new employer or its agents regarding the Employee's rights and obligations under this Agreement and the Non-Competition Agreement.

19.   **Cooperation**.  Following the date of termination of the Employee's employment for any reason, the Employee shall (a) reasonably cooperate with the Company, as reasonably requested by the Company, to effect a transition of the Employee's responsibilities and to ensure that the Company is aware of all matters being handled by the Employee and, (b) during the 24-month period following such date of termination, reasonably cooperate and provide assistance to the Company at its reasonable request in connection with any action, suit or proceeding brought by or against the Company, its direct or indirect subsidiaries, or any of their respective affiliates (or in which any of them is or may be a party) or that relates in any way to the Employee's acts or omissions while employed by the Company.  The Company shall reimburse the Employee for reasonable out-of-pocket expenses incurred by the Employee in connection with such cooperation (including reasonable legal fees approved in advance by the Company).

20.   **Section 409A Compliance and Specified Employee**.

(a)   Notwithstanding any provision of the Agreement to the contrary, this Agreement is intended to comply with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations and Treasury guidance thereunder (collectively, "Section 409A").  Accordingly, all provisions herein, or incorporated by reference, shall be construed and interpreted to comply with Section 409A.  In no event shall the Company be liable for, or be required to indemnify the Employee for, any liability of the Employee for taxes or penalties under Section 409A.  To the extent any potential payments or benefits hereunder could become subject to additional taxes or penalties under Section 409A, the parties shall cooperate to amend this Agreement to the extent legally permissible with the goal of giving the parties the economic rights and benefits described herein in a manner that does not result in such taxes or penalties being imposed, to the extent possible.  Further, for purposes of the limitations on nonqualified deferred compensation under Section 409A, each payment of compensation under this Agreement shall be treated as a separate payment of compensation (and not as a series of payments constituting a single payment).  Any amounts payable solely on account of an involuntary separation from service of the Employee within the meaning of Section 409A shall be excludible from the requirements of Section 409A, either as involuntary separation pay or as short-term deferral amounts to the maximum possible extent.  Any reimbursements or in-kind benefits provided under this Agreement shall be made or provided in accordance with the requirements of Section 409A, including, where applicable, the requirement that (i) any reimbursement is for expenses incurred during the period of time specified in this Agreement, (ii) the amount of expenses eligible for reimbursement, or in kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in kind benefits to be provided, in any other calendar year, (iii) the reimbursement of an eligible expense will be made no later than the last day of the calendar year following the year in which the expense is incurred, and (iv) the right to reimbursement or in kind benefits is not subject to liquidation or exchange for another benefit.  In no event may the Employee, directly or indirectly, designate the calendar year of any payment owed to him hereunder.

       **(b)**    If the Employee is treated as a "specified employee" (as reasonably determined by the Company in its discretion in accordance with applicable regulations under Section 409A) at the time of his separation from service (within the meaning of Section 409A) from the Company and each employer treated as a single employer with the Company under Section 414(b) or (c) of the Internal Revenue Code of 1986, as amended, and if any amount(s) of nonqualified deferred compensation (within the meaning of Section 409A) are payable by the Company or any member of its controlled group by reason of the Employee's separation from service, then payment of the amounts so treated as nonqualified deferred compensation that otherwise would be payable during the six-month period following the Employee's separation from service will be withheld by the payor and paid in a single lump sum on the earliest of (i) the first day of the seventh month following the date of such separation from service, (ii) the death of the Employee, or (iii) such earlier date on which payment is permitted under Section 409A(a)(2)(B).

[*The Remainder of This Page Intentionally Left Blank*]

This Agreement has been executed and delivered as of the date first above written.

**EVOLVE CELLULAR INC.**

By: _____

Name: _____

Title: _____

                Lowell Feldman

                CEO

**ALAN BERREY**

_____

*[Signature of Employee above]*

**Exhibit A**

Base Monthly  for the first16 months as follows:

| | |
|---|---|
| March 16: | $10,000 |
| April: | $10,000 |
| May: | $10,000 |
| June | $12,500 |
| July: | $12,500 |
| August: | $12,500 |
| September: | $15,000 |
| October: | $15,000 |
| November: | $15,000 |
| December: | $15,000 |
| January 17: | $15,000 |
| February | $15,000 |
| March: | $15,000 |
| April: | $15,000 |
| May: | $15,000 |
| June: | $15,000 |
| : | |

All revenue, gross profit and other financial amounts shall be calculated in accordance with the same principles used by the Company to prepare its financial statements for internal purposes.

Employee's Bonus beyond Base for the term of this Agreement shall be based on achievement of the following:

Exceeding $320,000 per month for two consecutive months during the term of this Agreement, but only so long as gross profit on such revenue exceeds 35%. When this occurs, Employee's Bonus shall be 3 % ofmonthly recurring revenue which the employee is responsible for (not including intercompany revenues, if any).

Until such time as the CEO with specific approval of the Board of Directors notifies Employee of revenue initiatives not under the responsibility of Employee, all revenue initiatives are under the responsibility of Employee.

**Exhibit B**

**GENERAL RELEASE AGREEMENT\***

This General Release Agreement is being delivered pursuant to Section 6(d)(i) of the Employment Agreement (the "Employment Agreement"), dated [_____], 2016, by and between Evolve Cellular Inc., a Texas corporation (the "Company"), and the undersigned Employee (the "Employee"). Capitalized terms used herein without definition shall have the meanings given to them in the Employment Agreement.

As a material inducement to the Company to make payments to the Employee pursuant to Section 6(c) of the Employment Agreement, and in consideration of the mutual promises made by the parties hereto, the Employee and the Company hereby agree as follows:

1.     **General Release**.

(a)     The Employee for himself, his heirs, beneficiaries, administrative representatives, executors, trustees and agents, and their respective successors and assigns (collectively, the "Employee Releasors") irrevocably, knowingly and unconditionally releases, acquits and discharges the Company and its parent entities, subsidiaries, affiliates, divisions and other related entities, and each of their respective past, present and future trustees, officers, directors, managers, affiliates, stockholders, members, employees, partners, employee benefit plans and their administrators and fiduciaries, advisors and counsel, and the successors and assigns of each of them (collectively, the "Company Parties") from any and all actions, causes of action, charges, complaints, claims, damages, demands, debts, lawsuits, rights, understandings and obligations of any kind, nature or description whatsoever, known or unknown, from the beginning of time through the date of execution of this general release relating to or arising from the Employee's employment with the Company (collectively, the "Claims").

(b)     This general release of Claims by the Employee Releasors includes, but is not limited to, (i) all Claims based upon actions or omissions (or alleged actions or omissions) that have occurred up to and including the date the Employee signs this agreement, regardless of ripeness or other limitation on immediate pursuit of any Claim in the absence of this agreement; (ii) all Claims relating to or arising out of the Employee's employment, engagement by, or separation from the Company; (iii) all Claims (including Claims for discrimination, harassment, wrongful discharge and retaliation) arising under any federal, state or local statute, regulation, ordinance, or the common law, including Claims arising under Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991, the Americans With Disabilities Act, the Age Discrimination in Employment Act of 1967 as amended by the Older Workers Benefit Protection Act ("ADEA"), the Employee Retirement Income Securities Act, the Family Medical Leave Act and the National Labor Relations Act; and (iv) all Claims for reinstatement, attorney's fees, interest, costs, wages or other compensation.

(c)     This general release does not (i) release (A) the Company from its obligations to the Employee under Section 6(c) of the Employment Agreement, (B) any matters relating to any equity or other ownership the Employee has in the Company or any of the other

Company Parties, or (C) the Company from any obligation to indemnify the Employee under any organizational document or written indemnification agreement with the Company or (ii) prevent the Employee from filing a charge with, providing information to or cooperating with any governmental agency, but the Employee agrees that he has waived the rights of the Employee Releasors, if any, to monetary damages, equitable relief and any other relief from the Company Parties with respect to the claims waived in this agreement and therefore the Employee Releasors are not entitled to receive any such damages or relief from the Company Parties in connection with any charge filed by the Employee Releasors or any action or proceeding brought by another person, entity or governmental agency.

2.      **Representations and Acknowledgements by Employee**.  The Employee represents and warrants that the Employee (a) has carefully read and understands all of the provisions of this agreement and has had the opportunity for it to be reviewed and explained by counsel, (b) is voluntarily entering into this agreement, (c) has not relied upon any representation or statement made by the Company or any other person with regard to the subject matter or effect of this agreement, (d) has not transferred or assigned any Claims, (e) has not filed any complaint or charge against any of the Company Parties with any local, state, or federal agency or court, and (f) returned to the Company all property and assets of the Company or any of its affiliates in the his possession or control. The Employee shall (a) reasonably cooperate with the Company, as reasonably requested by the Company, to effect a transition of the Employee's responsibilities and to ensure that the Company is aware of all matters being handled by the Employee and, (b) during the 24-month period following the date of the Employee's termination of employment from the Company, cooperate and provide assistance to the Company at its reasonable request in connection with any action, suit or proceeding brought by or against the Company, its direct or indirect subsidiaries, or any of their respective affiliates (or in which any of them is or may be a party) or that relates in any way to the Employee's acts or omissions while employed by the Company.  The Company shall reimburse the Employee for reasonable out-of-pocket expenses in connection with such cooperation (including reasonable legal fees approved in advance by the Company).

3.      **Notice and Right to Consider**.  The Employee has been advised to consult with an attorney before executing this agreement.  The Employee acknowledges that the Employee has been given the opportunity, if the Employee so desired, to consider this agreement for 21 days[1] before executing it.  For a period of seven days from the date the Employee signs this agreement, the Employee will retain the right to revoke this agreement by written notice to the Company before the end of that seven-day period.  This agreement will not become effective or enforceable until the expiration of such seven-day revocation period.

4.      **Attorneys' Fees in Action on Agreement**.  It is agreed that damages recoverable by (a) the Company Parties for breach of this agreement by the Employee Releasors or (b) the Employee Releasors for breach of this agreement by the Company Parties shall include all reasonable and documented out-of-pocket costs (including reasonable attorneys' fees) incurred by the Company Parties or the Employee Releasors, as applicable, as a consequence of such breach.

5.      **Interpretation**.  The language of all parts of this agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against the Employee

---

[1] 45 days, if required by ADEA.

Releasors or any of the Company Parties. The captions of the sections of this agreement are for convenience of reference only, and in no way define, limit, or affect the scope or substance of any section of this agreement. The Company Parties are intended third party beneficiaries of this agreement and, with the prior written approval of the Company, may enforce any breach of this agreement by the Employee Releasors.  This agreement may not be amended, modified or waived without the prior written approval of the Employee and the Company.

      **6.**      **Use of the Agreement as Evidence.**  This agreement may not be used as evidence in any subsequent proceeding of any kind, except one in which any of the Company Parties alleges a breach of the terms of this agreement or elects to use this agreement as a defense to any claim.

      **7.**      **No Admission of Liability.**  The parties acknowledge that their execution and delivery of this agreement is not and shall not be construed as an admission of any wrongful conduct or violation of any law but is simply in furtherance of an amicable and voluntary separation of the Employee's employment relationship with the Company which is deemed to be in the mutual best interests of the parties

      **8.**      **Claims Arising Afterward**.  Notwithstanding anything in this general release to the contrary, this general release shall not relinquish, diminish or in any way affect any rights or claims arising out of a breach by the Company or any of the Company Parties of the Employment Agreement after the date hereof.

      This Agreement has been executed and delivered as of the date first above written.

                                      _____

                                      [_____]

[\* If (i) there is any change in the law or in the interpretation of any law following the initial date of the Employment Agreement and (ii) the Company determines in good faith that a modification of this agreement is required as a result of such change in order to give effect to the purpose of this agreement, then the Company shall be entitled to so modify this agreement before the Employee signs it; provided that such modification does not materially alter the agreed-upon terms set forth herein, in which case the parties shall renegotiate this agreement in good faith.]

# CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

This Confidentiality and Non-Competition Agreement ("**Agreement**"), entered into as of _____, 2016 (the "Effective Date"), by and between (i) EVOLVE CELLULAR INC., a Texas corporation ("**Employer**") whose principal business office is located in the Austin, Texas area, and (ii) Alan Besly (the "**Employee**");

## WITNESSETH:

WHEREAS, the Employee has agreed to employment with the Company pursuant to the terms of an Employment Agreement dated on or about the date of this Agreement by and between the Employee and Employer (as modified from time to time, the "**Employment Agreement**");

WHEREAS, certain capitalized terms hereunder are defined in Section 7 of this Agreement;

WHEREAS, the Employee will be a key employee of the Company, with significant access to information concerning the Company and certain of its affiliates, and each of their respective businesses, including without limitation the development of the Company's business plans and strategies, its proprietary products and services, and key information about its customers and suppliers; and

WHEREAS, the disclosure or misuse of such information or the engaging in competitive activities would cause substantial harm to the Company, certain of its affiliates, and each of their respective businesses;

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto agree as follows:

1. **Confidentiality and Intellectual Property.**

    **(a)**     The Employee shall not at any time, directly or indirectly, disclose, divulge or use any Confidential Information, except (i) as reasonably required in connection with the performance of the Employee's duties for the Company, including as provided under the Employment Agreement, (ii) to the extent disclosure is required by law (but, to the extent permitted by law, only after the Employee has provided the Company with reasonable notice and opportunity to take action against any legally required disclosure), or (iii) in connection with the enforcement of the Employee's rights under any written agreement with the Company or under applicable law. Notwithstanding the foregoing, nothing in this Agreement shall prohibit the Employee from providing truthful information (including Confidential Information) about the Company or any other matter as may be required by law, in response to any court order, subpoena or other legal compulsion to disclose, or from cooperating with or providing truthful information (including Confidential Information) about the Company or any other matter to any governmental agency in connection with any inquiry by such agency.

(b)     Upon the Employee's termination of employment with the Company for any reason, or upon the Company's written request at any time and for any reason, the Employee shall immediately deliver to the Company all materials (including all soft and hard copies) then in the Employee's possession or control that contain or relate to Confidential Information and all other property of the Company; provided, that the Employee may deliver to his attorneys copies of any such materials to the extent necessary for the enforcement of the Employee's rights under any written agreement with the Company or under applicable law and the Employee shall be entitled to retain a copy of his address book, benefit plan elections, employment agreement, confidentiality and non-competition agreement, equity awards, and related documents.

(c)     All Developments made by the Employee, either alone or in conjunction with others, at any time or at any place during the Employee's employment with the Company, whether or not reduced to writing or practice during such period of employment, shall be and hereby are the exclusive property of the Company without any further compensation to the Employee. Without limiting the generality of the prior sentence, all Developments which are copyrightable work by the Employee are intended to be "work made for hire" as defined in Section 101 of the Copyright Act of 1976, as amended, and shall be and hereby are the property of Employer.

(d)     The Employee shall promptly disclose the Developments to Employer. If any Development is not the property of Employer by operation of law, this Agreement or otherwise, the Employee will, and hereby does, assign to Employer (or its designee) all right, title and interest in such Development, without further consideration, and will assist the Company and its nominees in every way, at the Company's expense, to secure, maintain and defend the rights of Employer (or such designee) in such Development. The Employee shall sign all instruments necessary for the filing and prosecution of any applications for, or extension or renewals of, letters patent (or other intellectual property registrations or filings) of the United States or any foreign country which the Company desires to file and relates to any Development. **The Employee hereby irrevocably designates and appoints Employer and its duly authorized officers and agents as the Employee's agent and attorney-in-fact (which designation and appointment shall be deemed coupled with an interest and shall survive the Employee's death or incapacity), to act for and on the Employee's behalf to execute and file any such applications, extensions or renewals and to do all other lawfully permitted acts to further the prosecution and issuance of such letters patent, other intellectual property registrations or filings or such other similar documents with the same legal force and effect as if executed by the Employee.**

2.     **Noncompetition.** During the Noncompetition Period, the Employee will not, directly or indirectly, as a stockholder, partner, member, manager, employee, consultant or owner of, lender to, or investor or participant in, any individual, partnership, firm, corporation or other entity (each, a "**Person**") other than the Company Parties, engage in or assist any other Person to engage in, any Covered Business anywhere in the Covered Area; provided, however, the passive ownership by the Employee of 3% or less of the outstanding voting securities of any Person whose securities are traded on a nationally recognized securities exchange or market (or, greater than 3% of such securities of any such entity, so long as the Employee's total investment in such entity does not exceed $1,000,000 in the aggregate) shall not constitute a violation of this Section 2.

2

3. **Nonsolicitation.** During the Noncompetition Period,

(a) The Employee will not, directly or indirectly, (i) solicit, or endeavor to entice away from, any Company Party, (ii) employ, hire or engage, or (iii) interfere with the business relationship of any Company Party with, any Person who is then, or was within the 12 months preceding such action, an employee of any Company Party or an individual independent contractor whose primary engagement is by a Company Party; provided, however, that nothing in this Section 3(a) shall be deemed to prohibit the Employee, directly or indirectly, from advertising employment opportunities in media of general circulation (provided that such advertisements do not target any individual who is or was an employee or independent contractor of any Company Party).

(b) The Employee will not, directly or indirectly, (i) solicit, or endeavor to entice away from, any Company Party, (ii) endeavor to reduce the business conducted with any Company Party by, or (iii) interfere with the business relationship of any Company Party with, any Person who is then, or was within the 12 months preceding such action, a customer, client, distributor, dealer, supplier, vendor, independent contractor (other than an individual independent contractor whose primary engagement is by a Company Party), consultant or service provider of or for, or other Person having a business relationship with, any Company Party.

(c) The Employee will not assist any Person in performing any activity prohibited by this Section.

4. **Nondisparagement.** The Employee will not, directly or indirectly, make any disparaging statement or other negative remarks, written or oral, about any Company Party or their respective Representatives. None of Employer or any of the other Company Group Members will authorize any director or officer of the Company Parties to, directly or indirectly, make any disparaging statement or other negative remarks, written or oral, about the Employee or his Representatives. This Section shall not prohibit any party from testifying truthfully as a witness in any court proceeding or governmental investigation or otherwise under legal compulsion to do so.

5. **Remedies.** Without limiting the remedies available to the Company Parties, the Employee acknowledges that a breach of any of the covenants contained in this Agreement by the Employee could result in irreparable injury to the Company Parties for which there might be no adequate remedy at law, and that, in the event of such a breach or threat thereof, the Company Parties shall be entitled to seek to obtain a temporary restraining order or a preliminary injunction and a permanent injunction restraining the Employee from engaging in any activities prohibited by this Agreement and such other equitable relief as may be required to enforce specifically any of the covenants contained in this Agreement, without any requirement to post a bond or prove damages. To the extent permitted by law, the losing party in any action for enforcement of the terms of this Agreement shall pay the reasonable attorneys' fees, costs and other expenses of the prevailing party incurred in connection with any Proceeding directly or indirectly relating to or arising out of this Agreement or any breach or alleged breach hereof.

6. **Acknowledgements.** The Employee represents and warrants that he (a) has carefully read and understands all of the provisions of this Agreement and has had the opportunity

3

for this Agreement to be reviewed by counsel, (b) acknowledges the highly competitive nature of the business of the Company Parties and that the duration, geographical scope and subject matter of this Agreement are reasonable and necessary to protect the goodwill, customer relationships, legitimate business interests, trade secrets and confidential and proprietary information of the Company Parties, (c) has not relied upon any representation or statement made by the Company Parties or their respective Representatives with regard to the subject matter of this Agreement, (d) will be able to earn a satisfactory livelihood without violating this Agreement, (e) is not a party to any agreement, commitment or obligation that could reasonably be expected to conflict with the Employee's obligations under this Agreement, or limit the Employee's ability to perform the Employee's duties for the Company and (f) acknowledges that the Company would not agree to employ the Employee without the benefits contained in this Agreement. The Employee understands and agrees that (i) this Agreement shall survive the termination of the Employee's employment for any reason, and (ii) no change in the Employee's compensation or employment duties after the date of this Agreement and the commencement of the Employee's employment with the Company shall alter or change the Employee's obligations under this Agreement.

7. **Defined Terms.** As used herein, the following terms shall have the following meanings:

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such specified Person.

"**Company**" means, collectively, Employer and its Controlled Affiliates, together with their respective successors and assigns.

"**Company Group Member**" means any of the Company, Worldcall Interconnect Inc. and Texas AirTowers LLC.

"**Company Parties**" means, collectively, (i) the Company Group Members, (ii) any supplier of goods or services to any Company Group Member; and (iii), together with their respective successors, assigns and affiliates; provided, that for purposes of Sections 2, 3 and 4 of this Agreement, the term shall not include any Person who becomes a Company Group Member following the date of termination of the Employee's employment unless the Company was actively planning to engage in a business arrangement with such Person during the Employee's employment with the Company.

"**Confidential Information**" means all Trade Secrets and all other information of a business, financial, marketing, technical or other nature relating to the business of the Company Parties, including, without limitation, (i) any customer or vendor lists, prospective customer names, financial statements and projections, know-how, pricing policies, operational methods, methods of doing business, technical processes, formulae, designs and design projects, inventions, computer hardware, software programs, business plans and projects pertaining to the Company Parties and (ii) any information of others that any the Company Party has agreed to keep confidential; provided, that Confidential Information shall not include any information that has entered or enters the public domain other than by reason of the breach by any Person of an obligation to keep such information confidential.

4

"**Controlled Affiliates**" means any Affiliate of a Person of which such Person directly or indirectly controls, which shall mean that such Person directly or indirectly has the ability to directly or indirectly direct or cause the direction of the management and policies (whether by contract or otherwise) of such Affiliate.

"**Covered Area**" means (a) any area in the United States where the Company Parties (i) do business or (ii) are actively planning to do business (as indicated by discussions of the Company's board of directors), in either case during the Employee's employment with the Company, and (b) if the Company Parties elect to pursue business outside of the United States, the areas outside of the United States where the Company Parties (i) do business or (ii) are actively planning to do business (as indicated by discussions of the Company's board of directors), in either case during the Employee's employment with the Company.

"**Covered Business**" means any business that directly or indirectly designs, develops, markets or sells platform technology and communications goods and/or services focused on supporting machine-to-machine, Internet of Things, unified communications, and customized wholesale mobile software and services, including without limitation services provided by, through or relating to gateway server abilities and software and mobile network operation interconnection services and/or related numbering rights (including number porting), SIM creation and management, and device certification. Without limiting the generality of the foregoing, such goods include customized integrated softphone products that may be embedded between mobile devices and gateway platforms. Such goods and services involved in a Covered Business include, without limitation, any good or service that enables consumers and business users, and their device suppliers, to (i) control the device for voice, data and instant messaging, (ii) manage the user's presence and services using their own software, and/or (iii) enable all services via a non-cellular based data network, including but not limited to the public internet. Such goods and services also include, without limitation, any good or service relating to: (i) voice and data services to consumers and businesses in markets covered directly by LTE licensed spectrum, and/or (ii) a MVNO wifi-first, cell phone service.

"**Developments**" means all inventions, modifications, discoveries, designs, developments, improvements, processes, software programs, works of authorship, documentation, formulae, data, techniques, know-how, secrets or intellectual property rights or any interest therein that (i) relate to the Business, (ii) are created or improved in whole or in part by using any resources, data, facilities or equipment of any Company Party or (iii) are created or improved within the scope of the Employee's employment with the Company.

"**Employer**" means any of the Company Parties that employs (or formerly employed) the Employee.

"**Investors**" means any party that holds an equity position in the Company and any of such holder's Related Persons).

"**Noncompetition Period**" means the period commencing as of the date of this Agreement and ending one years after the Employee ceases to be an employee of the Company for any reason; provided that if the Employee violates Section 2 or 3 of this Agreement, the length of the

Noncompetition Period shall be extended by a period of time equal to the period of time of the violation. For purposes of this Agreement and the related defined terms, the terms "employment," "employ," "employee" or words of similar import shall include any period in which the Employee is a consultant, director or manager of any Company Party.

"**Proceeding**" means any demand, claim, counterclaim, setoff, action, complaint, petition, suit, mediation, audit, inquiry, assessment, examination or other proceeding (whether at law or in equity), investigation, inspection or arbitration before or by a governmental authority.

"**Related Person**" means, with respect to any Person, (a) an Affiliate of such Person, (b) any investment manager, investment advisor, managing member or general partner of such Person, (c) any investment fund, investment partnership, investment account or other investment Person whose investment manager, investment advisor, managing member or general partner is such Person or any other Person described in this definition or, (d) upon or in connection with the dissolution or liquidation of such Person, any equity investor, member or partner of such Person.

"**Representatives**" means, with respect to any Person, the directors, officers, employees of, and individual independent contractors whose primary engagement is by, such Person, and, to the extent such relationship to any such Person is known to the Employee, the Affiliates, consultants, financial advisors, attorneys, accountants and agents of such Person.

"**Trade Secret**" means information that either (i) (A) derives actual or potential independent economic value from not being generally known to, and not being readily ascertainable by proper means by, the public or any other person who can obtain economic value from its disclosure or use, and (B) is the subject of efforts by the Company Parties that are reasonable under the circumstances to maintain its secrecy, or (ii) otherwise comes under the definition of a "trade secret" under any applicable law.

**8. Notices.** All notices, demands or other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered in person, by United States mail, certified or registered with return receipt requested, or by a nationally recognized overnight courier service, or otherwise actually delivered: (a) if to the Employee, to the address of the Employee in the Company's payroll records; (b) if to the Company, to the Company at 1250 S. Capital of Texas Hwy., Bldg. 2-235, West Lake Hills, Texas 78746, Attn: President; or (c) at such other address as may have been furnished by such person in writing to the other parties. Any such notice, demand or communication shall be deemed given on the date given, if delivered in person, on the date received, if given by registered or certified mail, return receipt requested or given by overnight delivery service, or three days after the date mailed, if otherwise given by first class mail, postage prepaid.

**9. Governing Law; Forum.** This Agreement, and any contest, dispute, controversy or claim arising hereunder or related hereto, will be governed by and construed in accordance with the internal laws of the State of Texas applicable to agreements made and to be performed in that state, without reference to its principles of conflicts of law that would apply the laws of another jurisdiction. The parties hereto irrevocably submit, in any Proceeding directly or indirectly relating to or arising out of this Agreement, to the exclusive jurisdiction of the courts of the State of Texas or any federal court (in each case located in

6

Travis County, Texas), consent that any such Proceeding may only be brought in such courts, waive any objection that they may now or hereafter have to the venue of such Proceeding in any such court or that such Proceeding was brought in an inconvenient forum and agrees to be bound by any judgment rendered thereby in connection with this Agreement. Each of the parties further agrees that a summons and complaint commencing a Proceeding in any of such courts shall be properly served and shall confer personal jurisdiction if served to it at the address and in the manner set forth in Section 8 or as otherwise provided under the laws of the State of Texas. This provision may be filed with any court as written evidence of the knowing and voluntary irrevocable agreement between the parties to waive any objections to jurisdiction, to venue or to convenience of forum.

10. **Claims of Employee are Separate Matters**. The existence of any claim or cause of action by Employee against any Company Party, whether predicated upon this Agreement or otherwise, shall not constitute a defense to the enforcement of the restrictive covenants set forth herein by any Company Party, but shall be claimed and litigated separately.

11. **Required Notice by Employee**. Employee shall notify any prospective employer of the existence and nature of this Agreement.

12. **Counterparts.** This Agreement may be executed in any number of counterparts, including counterpart signature pages or counterpart facsimile signature pages, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13. **Headings.** The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

14. **No Strict Construction.** The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises under any provision of this Agreement, this Agreement shall be construed as if drafted jointly by the parties thereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authoring any of the provisions of this Agreement.

15. **Waiver of Jury Trial. Each party to this Agreement hereby irrevocably and unconditionally waives to the fullest extent permitted by applicable legal requirements all right to trial by jury in any Proceeding (whether based in contract, tort or otherwise) directly or indirectly relating to or arising out of this Agreement.**

16. **Severability and Enforceability.** Employee and the Company agree that if any particular paragraphs, subparagraphs, phrases, words, or other portions of this Agreement are determined by a court of competent jurisdiction to be invalid or unenforceable as written, they shall be modified as necessary to be valid or enforceable, and such modification shall not affect the remaining provisions of this Agreement, or if they cannot be modified to be made valid or enforceable, then they shall be severed from this Agreement, and all remaining terms and provisions shall remain enforceable. Accordingly:

(a) The parties agree that the Noncompetition Period is fair, reasonably required for the protection of Company, and should be deemed valid and enforceable. However,

7

the parties agree that if a court called upon to enforce the Agreement considers the Noncompetition Period to be overbroad, the court shall have the authority to blue pencil or otherwise revise the Noncompetition Period to the extent necessary to satisfy the court that the Noncompetition Period is fair and reasonably required for the protection of Company.

        **(b)**    The parties express their desire that a court called upon to enforce any provision of the Agreement amend the parties' agreement to make the provision reasonable in the event the court determines such provision to be unreasonable. The parties agree that if a court considers a particular provision of this Agreement to be invalid, overbroad, vague, or otherwise unenforceable, the provision shall be deemed amended to the extent necessary to fulfill the intentions of the parties. If the court is unable to determine the intention of the parties, the offending provision shall be deemed amended to omit therefrom the language objected to by the court.

        **17.**    **Entire Agreement.** This Agreement and the Employment Agreement between the Employee and Employer dated on or about the date hereof supersede all prior contracts between the parties with respect to its subject matter and constitute a complete and exclusive statement of the terms of the contract between the parties with respect to the subject matter hereof and thereof.

        **18.**    **Binding Effect.** Neither party may assign this Agreement or any of his or its rights, duties or obligations hereunder, except that the Company shall have the right to assign this Agreement to any parent or subsidiary of the Company with the prior consent of the Employee (not to be unreasonably withheld, delayed or conditioned) or to any person or entity to whom or which all or substantially all of the business of the Company may be transferred. This Agreement shall be binding on and inure to the benefit of the parties hereto and their respective heirs, executors and administrators, successors and assigns.

        **19.**    **Amendments and Waivers.** This Agreement may be amended, modified or supplemented only by written agreement of Employer and the Employee. Any failure of the Employer to comply with any term or provision of this Agreement may be waived by the Employee, and any failure of the Employee to comply with any term or provision of this Agreement may be waived by Employer, at any time by an instrument in writing signed by or on behalf of such other party, but such waiver (a) shall only be valid if set forth in a written instrument signed by the waiving party and (b) shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure to comply. No failure to exercise or delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

        **20.**    **Third Party Beneficiaries.** The Company Parties are intended third party beneficiaries of this Agreement and, as such, shall be entitled to enforce the provisions of this Agreement.

[The remainder of this page is left blank intentionally.]

8

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date and year first above written.

EVOLVE CELLULAR INC.

By _____
     Name: _____
     Title: _____


_____

Alan Berrey

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date and year first above written.

EVOLVE CELLULAR INC.

By_____
    Name:_____
    Title:_____

Alan Berrey

## APPENDIX A

## NOTICE OF STOCK OPTION EXERCISE

Pursuant to that certain Non-Qualified Stock Option and Related Agreement, dated as of _____ 201_, as amended to date (the "Agreement"), by and between Evolve Cellular Inc., a Texas corporation (the "Company"), and the undersigned party, and subject to the vesting periods and other provisions set forth therein, the undersigned hereby irrevocably elects to exercise the Option to acquire _____ shares of Common Stock of the Company, at an exercise price of $60.181398050 per share, or an aggregate purchase price of $_____ for all such shares combined. Enclosed herewith is a check representing good funds made payable to the order of the Company in the amount of the aggregate purchase price set forth in the preceding sentence, and an executed original of the Special Buy-Sell Agreement referred to in the Agreement (provided, however, that if such Special Buy-Sell Agreement executed by the undersigned party has previously been provided to the Company and is currently in effect with respect to the undersigned party, then another copy of the Special Buy-Sell Agreement is not required to be delivered in connection with this exercise notice). Each capitalized term used herein, unless otherwise defined, has the meaning given such term in the Agreement.

The undersigned party hereby represents and agrees that the Exercise Shares purchased pursuant hereto are being purchased for investment and not with a view to the distribution or resale thereof, and that the undersigned understands that said Exercise Shares have not been registered under the Securities Laws.

Address of Optionee:

_____

_____

_____

Dated: _____

Name of Optionee: _____
Optionee's Signature: _____

14